### THE STATE v. THOMAS G. BARKER.

Argued February —, 1902—Decided June 9, 1902.

1. Whether the fact that some of the persons, whose names appear on the panel of jurors, are disqualified from jury service constitutes a good ground for challenge to the array, *quære.*

2. Assuming that such disqualification affords ground for challenge to the array, the party making the challenge must set forth in it the facts from which the disqualification is claimed to arise, and his failure to do so constitutes good ground of demurrer.

3. Section 140 of the National Guard act while it exempts, does not disqualify, members of the guard from jury duty.

4. The legislature has full power to prescribe the method by which the panel of jurors shall be selected for the trial of a criminal case, and also to prescribe the qualifications of such jurors, provided that the constitutional requirement of impartiality is not disregarded.

5. On the trial of an indictment, which charges the prisoner with the statutory offence of "committing an assault with intent to kill," evidence showing that the assault was committed under the influence of passion, caused by a reasonable provocation, is immaterial and incompetent.

6. Where the testimony, introduced at the trial of an indictment, clearly shows the guilt of the accused, a statement made by the prosecutor of the pleas, in his summing up to the jury, that "a verdict of acquittal would be a miscarriage of justice," affords no ground of exception.

---

On error to the Court of General Quarter Sessions of the Peace of Hudson county.

State v. Barker.                    68 N. J. L.

Before GUMMERE, CHIEF JUSTICE, and Justices VAN
SYCKEL, GARRISON and GARRETSON.

For the plaintiff in error, *Samuel Kalisch* and *Marshall
W. Van Winkle.*

For the state, *James E. Erwin,* prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE.   The plaintiff in error, who
was convicted of an assault upon one John Kellar with in-
tent to kill, seeks to have that conviction reversed for errors
alleged to have been committed at the trial.

The first assignment of error is directed at the action of
the court below in sustaining a demurrer to a challenge of
the plaintiff in error to the array of jurors.   The challenge,
which was in writing, set out many grounds for quashing the
array.   But three of them, however, were considered by coun-
sel of sufficient importance to be presented to this court, and,
under the settled practice, only these will be considered.

The first of these objections was that on the list of names
handed down by the judge, from which the jury was to be
struck, "are and were the names of persons who are and were
disqualified, at the time of their selection by the judge, to
serve as jurors herein."   Whether disqualification of one or
more jurors is a good ground of challenge to the array may
at least be doubted.   In *Thomp. & M. Juries* 115, § 139, it
is stated that the fact that persons who are disqualified from
jury service are included in the panel is not a ground for
challenge to the array.   The same statement appears in *Rap.
Crim. Pro.,* § 183.   In *Smith* v. *Smith, 23 Vroom* 207, it was
held by the Court of Errors and Appeals to be no ground for
a challenge to the array that one of the jurymen, whose name
appeared upon the list of names handed down by the judge,
from which the jury was to be struck, was dead.   In dispos-
ing of the matter the court says: "There was no objection to
the jury until the trial was called.   Had the attention of the
court been directed to this matter before that time another

name might have been supplied. There is no allegation that there was any design or collusion for the purpose of affecting the trial, or that the defendants were prejudiced, and the statute makes ample provision for the required number of jurymen by an award of tales, to call others until the panel is full for the trial." The same conditions which are referred to in the cited case existed in that now under consideration, and would seem to justify the overruling of the challenge so far as it was rested upon the presence upon the panel of one or more persons who were disqualified to serve as jurors.

Assuming, however, that the presence upon the panel of persons who are disqualified is good ground of challenge to the array, the challenger must set forth in his challenge the facts from which the disqualification arose. Whether or not a man is disqualified to serve as a juror is a conclusion of law to be drawn by the court from the facts submitted to it. In *Mann* v. *Glover,* 2 *Gr.* 195, 203, Chief Justice Hornblower says: "A challenge must be in such terms that the court can determine whether the facts, if true, are sufficient to support such challenge. The defendant says he challenges the juror because 'he does not stand indifferent between the parties.' But these words do not constitute a challenge; they express only the reason for making the challenge or the judgment or conclusion of law consequent upon finding the ground of challenge to be true. He must go further, and state *why* the juror does not stand indifferent; he must state some facts or circumstances which, if true, will show that the juror is positively and legally disqualified." The point in that case came up as it does here—upon the overruling of a challenge without hearing testimony in support of it. On the authority of the case cited, the sustaining of the demurrer, so far as this ground of challenge is concerned, was proper. The allegation that some of the men whose names were upon the list were not qualified to serve as jurors, being a conclusion of law, and not a statement of fact, its truth is not admitted by the demurrer. A demurrer only admits *the facts* set out in a pleading, and not then unless they are sufficiently pleaded.

The second ground of challenge relied on by the plaintiff in error is that "one William F. Toffey, whose name is among the forty-eight names included in the venire, is exempted from jury duty by reason of service in the national guard." Section 140 of the revision of the National Guard act (*Pamph. L.* 1900, *p.* 458) declares that "every member of the national guard shall be exempt from jury duty." This statutory provision does not create a disqualification. It confers a personal privilege, by virtue of which a member of the national guard, on his own motion, is entitled to be excused from jury service. That which exempts, but does not disqualify, affords no ground for challenge. *Patterson* v. *State,* 19 *Vroom* 381; *Smith* v. *Smith, supra.*

The third ground of challenge argued before us is that the jury (which was a struck jury) was not properly selected, for the following reason, viz.: "The jury herein had been drawn under the act of 1898, section 76, and, being drawn thereunder, does not amount to a struck jury—that is, one of special talents," &c. Section 76 of the act of 1898 provides that "when a rule for a struck jury shall be entered in any criminal case, the court granting such rule may select from the persons qualified to serve as jurors in and for the county, ninety-six names, from which the prosecutor and the defend-ant shall each strike twenty-four names in the usual way, and the remaining forty-eight names shall be placed by the sheriff in the box in the presence of the court," &c. *Pamph. L., p.* 895. The contention of the plaintiff in error is that a struck jury must be selected from among those persons, competent to serve as jurors, who are, in the opinion of the judge striking the jury, best qualified, as to talents, knowledge, integrity and independence, to try the case; and that the act of 1898, because it fails to provide for such a selection, is invalid. The reasoning of counsel is that because almost from the time of the adoption of the constitution of 1776 down to the passage of the act of 1898, struck juries have been required, by statute, to be selected from among those persons who had the qualifications which have been specified, therefore the legislature infringed a right given by

the constitution to persons under indictment, by providing for the selection of a struck jury from the whole body of the qualified jurors of the county. This, is conspicuously a *non sequitur*. The constitution secures to a person under indictment a speedy and public trial by an impartial jury. It does not define the means by which such jury shall be obtained, nor does it contain any prescription with relation to the qualifications of jurors other than impartiality. These matters are left in the discretion of the legislature without restriction or limitation. *Brown* v. *State,* 33 *Vroom* 666, 678. The fact that for a period of more than a hundred years the legislature has considered it advisable that struck juries should be selected from among persons best qualified by particular talents, knowledge, &c., to try the cause, did not confer any right upon persons accused of crime, to have this characteristic in the makeup of struck juries perpetually continued. The right of the legislature to make the change which appears in the act of 1898 has always existed, though not exercised for more than a century.

The second assignment of error argued by counsel deals with the refusal of the court below to permit the defendant to put in evidence certain conversations had by him with his wife and another person. It appears from the terms of the offer that if the defendant had succeeded in his attempt to kill Kellar, and had been indicted for murder, these conversations, under certain conditions, might have been competent evidence on the question of the degree of his guilt; and the contention of his counsel is that they were equally admissible, although his attempt was unsuccessful. The offence charged in the indictment is a statutory one. Section 113 of the revision of the Crimes act, as amended in 1900 (*Pamph. L., p.* 45), declares that "any person who shall commit an assault with intent to kill, or with intent to commit any burglary, rape, robbery, &c., shall be guilty of a high misdemeanor." The argument in support of this assignment is that the gravamen of the offence is the intent with which the assault is committed; that the expression "an intent to kill" is synonymous with "an intent to commit murder," for the

reason that a felonious killing, done in the execution of a pre-existing intention, is murder, and not manslaughter, the absence of an intent to take life being a distinguishing feature of the latter crime, and that the defendant was entitled to prove anything which would tend to show that his crime, if the assault had resulted in Kellar's death, would not have been murder.

We think this argument rests upon a false premise. It is true that it is frequently stated in the books that the absence of malice is one of the characteristics of manslaughter, and that by malice is meant the intent to take life. The statement, however, is not, in our opinion, entirely accurate. Many cases might be suggested where, although the intent to take life was present when the fatal wound was inflicted, yet the crime would be manslaughter and not murder. One instance by way of illustration will be sufficient. B discovers his wife in the act of adultery with X. Up to that time he has had no suspicion that an improper intimacy exists between them. His mind immediately becomes so inflamed with passion at what he sees that nothing except the life of the man who has so wronged him will satisfy him, and he forthwith kills X with the first weapon which comes to his hand. Although the intent to take life exists, the absence of deliberation and premeditation, and the fact that the killing was done in a transport of passion, upon a reasonable provocation, reduces the grade of the offence to manslaughter.

The history of the statutory provision, under which the present indictment was found, shows that the legislature considered that an intent to kill was not necessarily an intent to commit murder, and that an intent to take life might be present where the crime would be manslaughter. The amendment of 1900 to the one hundred and thirteenth section of the Crimes act made no change in the character of the crime charged against the defendant in the indictment. It followed the language of the revision of 1898 (*Pamph. L.*, *p.* 825, § 113) in declaring that any person who shall commit "an assault with intent to kill * * * shall be guilty of a high misdemeanor." Prior to the revision of 1898, however,

this provision read: "Every person who shall be convicted of an assault with intent to commit any murder, manslaughter, burglary, robbery, &c., shall be deemed guilty of a misdemeanor, and shall be punished by," &c. *Gen. Stat., p.* 1063, § 78. This provision, in the words last set out, appears originally in our Crimes act as revised in 1846. *Rev. Stat., p.* 268, § 40. It remained upon the statute-book, in these words, until the revision of 1898. See *Nix. Dig., Crimes act,* § 40; *Rev.* 1874, *p.* 241, § 78. At the time of its adoption in 1846, the legislature also, for the first time, enacted that provision of our criminal law which declares that "all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, &c., shall be deemed murder of the first degree." *Rev. Stat., p.* 258, § 4. The legislation referred to justifies two conclusions—*first,* that the legislature, having prescribed in section 4 of the act of 1846 the characteristics which should constitute murder of the first degree, and then, in section 40, having declared that an assault *with an intent to commit manslaughter* should be a misdemeanor, did not consider that an intent to take life, without more, was a distinguishing feature of the crime of murder; but, on the contrary, recognized that such an intent might be present where the crime was manslaughter; *second,* that the design of the legislature, by amending, in the revision of 1898, the section of the Crimes act under which this indictment is found, so as to read: "Any person who shall commit an assault with an intent to kill," &c., instead of "with an intent to commit any murder, manslaughter," &c., was to do away with the necessity of alleging or proving the character of the homicide which was intended to be committed by the accused; and to make it sufficient to allege and prove that the assault was committed with the intent to feloniously take life, without regard to what the degree of the crime would have been had the attempt been successful. It follows that testimony offered by the accused for the purpose of showing that at the time of committing the assault his mind was inflamed by passion, produced by a reasonable cause, was immaterial; the question

at issue being whether he intended to feloniously take the life of Kellar, and not whether he intended to commit murder.

It is further argued, under this assignment of error, that the conversations which were excluded were competent for the purpose of showing that the defendant was insane at the time of committing the assault. So far as the bills of exceptions disclose, no other testimony was offered which even tended to show such a mental condition. The excluded conversations standing alone were not evidential upon that point.

The conversations were properly excluded.

The third assignment of error argued by counsel is directed to the exclusion by the court below of a question put on behalf of the defendant to Dr. Evans, an insanity expert called by the defendant. It appears that the witness had, shortly before the trial, made an examination of the defendant for the purpose of ascertaining whether or not he was sane. During their interview (so the witness testified) the defendant told him "of a great wrong which he said had been done to him—the violation of the sanctity of his home." The question excluded sought to obtain from the witness the details of what the accused had said to him upon this point. There was no error in overruling this question. The witness, although he had, as an expert, examined into the mental condition of the defendant, did not (so far as appears by the bills of exceptions) express any opinion upon that point while on the witness-stand; in fact, he was not examined upon the point at all. If he had been, and had expressed an opinion as to the mental condition of the defendant, and had based that opinion partly upon the conversation had with him, it would have been competent for the state, and, perhaps, for the defendant, although it is not necessary now to decide, to inquire into the details of the conversation, for the purpose of testing the value of the expert's opinion; but, under the conditions which existed when the question was asked, it was no more competent for Dr. Evans to testify to this conversation than it would have been for the jailer who had the defendant in custody, or any other non-expert witness.

The next assignment of error insisted on by the defendant

is rested upon the allowance by the court below, against objection, of the following questions put by the prosecutor of the pleas to the defendant upon his cross-examination:

"Did you ever shoot anybody before?

"Didn't you shoot a man out west one time?

"Didn't you threaten to shoot a person who had shot your dog?"

To each of these questions the defendant answered "No."

That those questions were incompetent and should have been excluded we have no doubt. But we do not think that their admission will justify the reversal of the judgment under review. By the law of this state it is not enough, for the purpose of overthrowing a judgment in a criminal case, that errors of law have entered into the proceedings. In addition to the existence of error in law it must be shown that such error was, or might have been, prejudicial to the defence on the merits. *Hunter* v. *State,* 11 *Vroom* 495, 542; *Genz* v. *State,* 30 *Id.* 494.

It is not perceived that the questions objected to, answered as they were, by the defendant, in the negative, could have so prejudiced the plaintiff in error.

The next exception argued before us was taken to a statement made by the prosecutor, in his summing up to the jury, that "a verdict of acquittal would be a miscarriage of justice."

In the case of *People* v. *Fielding,* 158 *N. Y.* 542, relied upon in support of this assignment, it is declared to be error to permit appeals by the prosecutor of the pleas to the prejudice of the jurors, based upon facts which have not been proved, but which rest wholly on his unsupported assertions; and that when proper exception is taken thereto, and it is apparent that such appeals may have influenced the jury in their verdict, the conviction should be set aside. Many cases are referred to, in the opinion of the court in that case, which support the conclusion reached. We approve the doctrine of that case, but do not consider it applicable to the matter now under discussion. Nothing appears in the record sent up to show that the prosecutor was not entirely within his privilege in making the remark which was objected to. Where counsel,

in his summing up to the jury, confines himself to the evidence in the case, what is said by him in its discussion, by way of comment, denunciation or appeal, affords no ground of exception. *Williams* v. *Brooklyn Elevated Railroad Co.,* 126 *Id.* 96.

If the evidence clearly showed, as was contended by the prosecutor, that the defendant had committed an assault upon Kellar with the intention of killing him, and that his act was entirely without legal justification, a verdict of acquittal would, beyond question, have been a miscarriage of justice, and a statement to that effect by the prosecutor was entirely justifiable.

The only other exceptions discussed by counsel relate to the charge to the jury and to the refusal of the court to charge certain requests submitted on behalf of the defendant. A full examination of the charge, and also of the requests, satisfies us that there was no error in these respects.

After a careful consideration of all the points argued, we are of opinion that this judgment should be affirmed.