STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
S. GRILL D'IPPOLITO, DEFENDANT-APPELLANT.

Argued October 17, 1915—Decided October 31, 1955.

*Mr. Carl Kisselman* argued the cause for the appellant.

*Mr. George H. Stanger,* Cumberland County Prosecutor, argued the cause for the respondent (*Mr. Wallace R. Foster,* Assistant County Prosecutor, on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J.   This appeal was taken by the defendant to the Appellate Division of the Superior Court from a judgment of conviction for the crime of false swearing (*N. J. S.* 2A:131–4) entered after trial by jury in the Law Division of the Superior Court and certified by us while pending below.

## I.

The defendant, the Chief of Police of the City of Vineland, was indicted by the Cumberland County Grand Jury for falsely swearing as to the evidence he discovered on a gambling raid.   It appears that on March 26, 1953 the defendant and Patrolman Joseph Callavini, acting on information which led the police to suspect that one Louis Levenberg was taking bets on the outcome of horse races or, in the vernacular, "making book" at his "art school" on Landis Avenue in

Vineland, raided his establishment. According to Callavini, while both he and his superior were searching for evidence that would prove the book-making activity in the premises, the telephone rang. The defendant answered it and began to write "horse bets down on the paper." The defendant clarified the occurrence. He stated that when he answered the telephone the caller asked for "Lou." When he said that he was "Lou," the caller, evidently becoming suspicious, hung up. The defendant, hoping to lure Levenberg into admitting that he was bookmaking, pretended the caller was still on the wire, reached for the notebook and began to write down fictitious horse bets. When the defendant hung up the telephone, Levenberg said "You didn't take no bet for me to book, because I am not a bookmaker."

The main issue arises in connection with the property found on the premises. For the State Callavini testified that, in addition to a newspaper, a racing form and a small portable radio found in the premises, the defendant found betting slips; that the slips when he first saw them were "on the desk," but that he actually didn't "know where he [the defendant] found them"; that he carried the radio and the chief carried the racing forms, the newspaper and the betting slips.

Levenberg was arrested and taken to police headquarters, where he insisted to the police upon further interrogation that he was not a bookmaker, but a bettor who had been placing bets with a bookmaker by the name of Reuben. Acting on the information supplied by Levenberg, the defendant and Callavini raided Reuben's premises and arrested him, but discovered no evidence there.

Both Levenberg and Reuben were subsequently arraigned on April 6, 1953 before Municipal Magistrate Frank J. Testa on charges of bookmaking. The defendant testified as a complaining witness under oath before the magistrate. No stenographic record of that hearing was made but the magistrate testified at the trial that "he [the defendant] said that he found nothing but a racing form and a morning newspaper, and so I asked him whether he found any slips

or any other thing that might indicate to him gambling was going on, and he seemed to be apologetic and raised his hand like this (indicating) and said, 'I don't know why I raided this place.' He said something about expecting to find someone else there. That is all he found." The court clerk corroborated the magistrate's version. The case against Levenberg was dismissed by the magistrate. At the trial, the defendant categorically denied that the search produced anything more than he had testified to on the arraignment and he was equally positive that he had told the magistrate that a radio was seized.

In opening to the jury the prosecutor announced that the State was prepared to show that there was a report made up for the police department's own use and put in its files, that the report stated the fact that betting slips had been found, and that when a demand was made by the State Law Enforcement Council on the defendant, as the then chief of police, for police reports of all gambling raids, the report suddenly disappeared and that "in its place was a report dictated by S. Grill D'Ippolito to Officer Callavini, who was on the raid, but in that report there was no mention made of any betting slips or of any telephone calls, and that that was the report which was submitted to the Law Enforcement Council of what happened at the time of the raid."

During the progress of the trial the prosecutor made extraordinary efforts to prove the facts asserted in his opening. His initial effort was thwarted because of his failure to lay the necessary foundation for admission of a copy instead of the original report. He suspended his examination of Callavini in order to establish by the testimony of two other officers in the Vineland Police Department that a copy of the report had been made and that the original had disappeared. In the process of so doing the prosecutor indicated to the court in the presence of the jury that this report made by Callavini was:

"\* \* \* certainly corroborative and demonstrative evidence to the jury to corroborate the testimony of Callavini as to what did take place there that day, which we are entitled to present to the

jury, and in the third place I think as part of the evidence in this case showing that there was false testimony is the evidence that this report disappeared from the files and another report was substituted, which we will show by Callavini's testimony was dictated by the chief of police and substituted in its place."

His subsequent efforts at obtaining its admission were struck down by the trial court for the reason that the report was "not the best evidence," because Callavini had been able to testify from his own recollection of the events that occurred, that Callavini could not corroborate his own testimony by written statements, which were the product of his own work and that it was in the nature of a self-serving declaration. The prosecutor still attempted to prove by Callavini that a substitute report had been dictated by the defendant, but was stopped by the court.

It was subsequently brought out by testimony of the defendant himself on redirect examination that he had suggested to the Law Enforcement Council that it should have copies of all police reports in gambling cases and that he then instructed Sergeant Stickert of his department to get out these reports for the Council's representative. When it was discovered that there was no report in the Levenberg file, he directed Callavini to make one out to the best of his recollection and to include as the disposition that the case was dismissed for lack of evidence. Stickert, called on behalf of the defendant, testified that Callavini made out the new report and he put the original in the police file and put a copy in with copies of the other reports for the Council. Callavini denied that Sergeant Stickert was present when he was directed to make out the new report by the defendant.

Further important facts are necessary in the discussion and decision of this case; during the course of the prosecutor's summation to the jury he commented as follows:

"I want to point out one other significant factor to you ladies and gentlemen, which you have heard in other criminal cases. Character witnesses could have been called by the defendant in this case—
*Mr. Kisselman*: I move for a mistrial, your Honor.
*The Court*: I sustain the objection.
*Mr. Kisselman*: I move for a mistrial.

> *The Court*: I will permit you to put your reasons down, but I will deny it.
>
> *Mr. Kisselman*: I think that is the most outrageous thing I have heard in 33 years before the bar.
>
> *The Court*: There is no obligation to present that type of evidence, Mr. Stanger, and I will sustain the objection, and I ask you to refrain from that type of testimony.
>
> *Mr. Stanger*: I will not go any further with it, if your Honor please."

The prosecutor conceded at the oral argument that if he had not been stopped, he was prepared to go further with this line of approach.

The jury found the defendant guilty. The defendant contends that these comments by the prosecutor on the failure of the defendant to call character witnesses were highly improper and prejudicial; that the continued and unusual persistence of the prosecutor in renewing his attempts to get the Callavini report in evidence and his arguments and declarations before the jury on behalf of admission of that report and its substitute to bolster his opening statements to the jury were unfair and prejudicial, and that by reason thereof a new trial should be granted. His motion to that end was denied and from such denial he appealed.

## II.

■ The rule is beyond question that, in a criminal case, the prosecution cannot offer evidence of the character or reputation of the defendant unless the defendant himself raises the issue, *State v. Raymond*, 53 *N. J. L.* 260, 21 *A.* 328 (*Sup. Ct.* 1891); *State v. Hauptmann*, 115 *N. J. L.* 412, 436, 180 *A.* 309, 624 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 641 (1935); *State v. Steensen*, 35 *N. J. Super.* 103 (*App. Div.* 1955); *Michelson v. United States*, 335 *U. S.* 469, 69 *S. Ct.* 213, 93 *L. Ed.* 168 (1948); I *Wigmore, Evidence* (*3rd ed.* 1940), § 56, *pp.* 450, 454.

■ Wigmore points out not only that a defendant in a criminal case "may offer his good character to evidence the

improbability of his doing the act charged" but also, that "the rule, then, firmly and universally established in policy and tradition, is that *the prosecution may not initially attack the defendant's character*" (*p.* 456) (italics supplied). In the instant case the defendant had offered no evidence as to his character. From his failure to do so no inference of bad character can be drawn. On the contrary, he is privileged to keep the subject neutral, *State v. Hauptmann, supra,* 115 *N. J. L.,* at *page* 436.

In commenting even slightly on the failure of the defendant to call character witnesses, the prosecution was attempting to do indirectly what he could not do directly in this case—attack the defendant's character by inferring that it was bad. In *State v. Shipley,* 174 *Mo.* 512, 74 *S. W.* 612, 613 (*Sup. Ct.* 1903) the court noted:

"What the prosecuting attorney was not allowed to do by testimony he did more effectually by asserting as a fact in his official character. * * * in our opinion, it was a statement of a most hurtful fact by the prosecuting officer of the county in his closing speech. Had he offered evidence to prove defendant's bad character before defendant had put his character in issue, the court would have excluded it. Of what avail is it, then, for courts to exclude incompetent evidence if counsel may, under the guise of argument, state facts which are not in evidence, and clearly inadmissible? Error is presumptively harmful, and it devolves upon the party who commits it to show that it could not possibly have resulted in injury. Especially is this true where the life or liberty of a citizen is at stake."

If the State had offered proof of bad character, it would necessarily have had to be excluded, since the defendant had offered no evidence of his good character. The inference it suggests was even more disastrous to the defendant than such an improper question and its rejection would have been. In a case such as this where the decision of the jury as to the guilt or innocence of the defendant depends on whether it believes the prosecution's witness or the defendant, a statement by the prosecutor as to the failure of the defendant to produce character witnesses raises a grossly improper issue as to the character of the defendant, which violates our funda-

mental sense of fair play. Planted in the minds of the members of the jury just before they retire to consider their verdict, this highly insidious inference as to bad character is most damaging and prejudicial to the defendant, and particularly so when no specific attempt is made to erase the effect, if in fact it ever can be done, by immediate retraction, excuse and explanation or by a definite charge thereon by the trial court.

The probative value of character evidence on behalf of the defendant at the best is strictly limited. Its function has been well described in *State v. Randall*, 95 *N. J. L.* 452, 455 (*E. & A.* 1920):

"The jury should consider all of the relevant testimony, including that relating to the defendant's good character or reputation, and if, on such consideration, there exists reasonable doubt of his guilt, even though that doubt be engendered merely by his previous good repute, he is entitled to an acquittal; but if, from the entire evidence, including that relating to good character, the jury believe the defendant guilty beyond a reasonable doubt, he should be convicted and the evidence of good character should not alter the verdict. And that was right. *Baker v. State*, 53 *N. J. L.* 45, and cases collected in 16 *C. J., p.* 981."

The prosecution should never be permitted to turn the defendant's failure to avail himself of the privilege of introducing character evidence in his own behalf into an affirmative weapon against him.

While it is true that no request appears to have been made on behalf of the defendant to charge the jury to disregard the remark, in the circumstances here present the probability of prejudice was so great and the error so substantial as to require notice of it to be taken by us, *R. R.* 1:5–1, and to grant a new trial.

This is not the first case in recent years involving error caused by an overzealous prosecutor bent more on obtaining a conviction than on seeing that justice is done. We have had to point out such transgressions on various occasions and to emphasize the bounds of propriety in the exercise of the duties of a county prosecutor, *State v. Orecchio*, 16 *N. J.* 125, 140

(1954); *State v. Bogen*, 13 *N. J.* 137 (1953); *State v. Ferrell*, 29 *N. J. Super.* 183 (*App. Div.* 1954); *State v. Bartell*, 15 *N. J. Super.* 450, 458 (*App. Div.* 1951), affirmed 10 *N. J.* 9 (1951). These incidents have not been limited to our State alone, see the cases collected in 52 *A. L. R.* 1022; 80 *A. L. R.* 227; 84 *A. L. R.* 784, 127 *A. L. R.* 357, 29 *A. L. R.* 2d 996, 1000.

The responsibilities of a prosecutor within his county are prescribed by *N. J. S.* 2A:158–5:

"Each prosecutor shall be vested with the same powers and be subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to, and he shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."

The quality of his performance of his duties is governed by *Canon 5 of the Canons of Professional Ethics* (*R. R.* 1:25) which states that:

"* * * The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."

And he is also subject, as are all members of the bar, to the dictates of *Canon* 15 detailing how far a lawyer may go in supporting a client's cause, of *Canon* 18 dealing with the treatment of witnesses and litigants, and of *Canon* 22 calling for candor and fairness. A public prosecutor has special responsibilities which have never been better described than by Mr. Justice Sutherland in *Berger v. United States*, 295 *U. S.* 78, 88, 55 *S. Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935):

"The * * * [prosecuting] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—

indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. \* \* \*"

See also *State v. Barker*, 68 *N. J. L.* 19 (*Sup. Ct.* 1902); *State v. Lang*, 75 *N. J. L.* 1 (*Sup. Ct.* 1907), affirmed 75 *N. J. L.* 502 (*E. & A.* 1907), affirmed 209 *U. S.* 467, 28 *S. Ct.* 594, 52 *L. Ed.* 894 (1908); *State v. Hauptmann*, 115 *N. J. L.* 412 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 641 (1935); *State v. Transimore*, 3 *N. J.* 516 (1950); *State v. Grillo*, 11 *N. J.* 173, 184 1952), *certiorari* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391 (1953). A public prosecutor must not only be zealous in enforcing the law, he must consistently refrain from any conduct that is lacking in the essentials of fair play. Where his conduct has crossed the line and resulted in foul play, we have not hesitated to reverse the decision below and remand it for a new trial. The right to a fair trial must be preserved by every means at our command.

## III.

■■ One further point requires mention so that on the new trial some of the confusion we find in this record may be avoided. The trial was dominantly concerned with Callavini's missing report, the alleged copy thereof and the substitute report allegedly "dictated" by the defendant. It would appear that the trial judge was correct in excluding the proof of the original report or the alleged copy thereof merely as being corroborative of the personal recollection of Callavini. Prior consistent statements, oral or written, of a witness are inadmissible for the purpose of showing the truth or probability of the testimony of the witness from his own recollection.

Repetition does not make a fact more probable. Such evidence, if not hearsay, is nevertheless irrelevant. 4 *Wigmore, Evidence* (*3rd ed.*) § 1124, *p.* 194.

"The rule permitting extra-judicial, consistent statements of a witness is an unusual one; it should be applied with caution and within the narrow limits of the rehabilitation of credibility rule. Otherwise a witness' credibility will 'depend more upon the number of times he has repeated the same story than upon the truth of the story itself.' 58 *Am. Jur., Witnesses, sec.* 819." *State v. Griffin,* 19 *N. J. Super.* 581, 587–588 (*App. Div.* 1952).

It would also appear, however, that this document or its alleged true copy would be relevant when offered, in connection with the substitute report, to show that such a report had in fact existed, that it was missing or destroyed and that a substitute, omitting reference to betting slips, was made for it at the instance of the defendant to conform with the facts of his sworn testimony before the arraigning magistrate. If it was shown that the defendant had knowledge of and agreed with the contents thereof or that the reports were in fact made under his direction, they would be admissible, *Wigmore on Evidence* (*3rd ed.*) §§ 1071, 1073; see also annotation under *Rules* 63 (7) and (8) in *Report of the Committee on the Law of Evidence to the Supreme Court,* May, 1955, *pp.* 135–137. They would be previous statements of the defendant or adoptive admissions by which he would be bound, and would bear not only on the credibility of the defendant's denial that he swore falsely but also on the probability of the fact of false swearing. The ultimate introduction of these documents is attended by other fundamental requirements and considerations which when satisfied would make them admissible, *Wigmore, supra.* We see no error in the conduct of the prosecutor on this score. It was his duty to procure the introduction of such evidence and if thwarted by the misunderstanding of the trial judge, he cannot be condemned for his failure to accomplish the desired result.

The judgment below is reversed and a new trial granted.

HEHER, J. (dissenting). I am not persuaded that the prosecutor's unfinished statement engendered prejudice utterly

immune to the remediable process of an appropriate instruction. The trial judge acted promptly and decisively and in peremptory terms expunged the remark and the issue from the case and the jury's consideration. Counsel did not ask for a supplemental instruction; indeed, he did not want it; he deemed a mistrial the only means of doing justice.

A motion for a mistrial is addressed to the sound discretion of the court; it is a power exercised with the greatest caution, in the furtherance of justice between the accused and the State, and not allowable of right unless the vice is plainly ineradicable. And, absent a specific request by counsel, a curative instruction is not ordinarily the duty of the trial judge, where a mistrial is refused. *State v. Witte*, 13 *N. J.* 598, 612 (1953).

I would affirm the judgment.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice HEHER—1.