144 N.J. Super. 268 (1976)
365 A.2d 224
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
NICHOLAS A. LAGANELLA, AND P.T. & L. CONSTRUCTION COMPANY, INCORPORATED, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1976.
Decided August 18, 1976.
*271 Before Judges FRITZ, SEIDMAN and MILMED.
Mr. Richard W. Berg, Deputy Attorney General, argued the cause for appellant (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
*272 Mr. Theodore W. Geiser argued the cause for respondents (Messrs. McElroy, Connell, Foley & Geiser, attorneys; Mr. Kevin J. Coakley on the brief).
The opinion of the court was delivered by FRITZ, P.J.A.D.
Two important questions present themselves in this appeal by the State from the dismissal of the indictment by the trial judge during the State's case. These involve (1) the considerations which should affect the exercise of discretion by a trial judge in dealing with discovery problems in the criminal trial, and (2) double jeopardy. We address ourselves to the problems in that order, for if the trial judge was correct in the sanction he applied, we need not reach the second problem.
The individual defendant, Nicholas A. Laganella, and the corporate defendant, P.T. & L. Construction Co., Inc. (P.T.&L.), of which Laganella was president, were indicted for "bid rigging" conspiracy on a substantial highway construction project. The proofs on which the State's case was bottomed demonstrated that sometime prior to February 8, 1968 Laganella conspired with Sam Braen Construction Co. (Braen) and Braen Industries, Inc., to produce from the latter companies a bid on the project, but at a higher figure than the P.T.&L. bid, thereby insuring P.T.&L. of the contract. A consideration of $185,000 for this cooperation was offered by P.T.&L. to Braen, and ultimately sophisticated schemes of payment were devised. These arrangements were worked out in large part between Harry G. Evans, a graduate civil engineer, who was vice-president and manager of Braen, and Laganella.
Evans, obviously the head of operations for Braen under Sam Braen, Sr. and, from the proofs, the prime and probably only negotiator with Laganella, testified at length.
Sam Braen, Sr., described by Evans as the "owner" of Sam Braen Construction Co. and the several other affiliated Braen companies, was regularly consulted and made all the decisions. Sam Braen, Jr., the son of Sam Braen, Sr., was *273 said to be "gradually assuming control of all the companies," and the State's proof indicated that he was present at a meeting between Evans and Laganella. His participation at that meeting was said to be limited to his being a "witness to the conversation." While the testimony of one witness indicated Sam Braen, Jr. was in fact "actively involved" in the day-to-day activities of Braen, the proof from Evans and others also indicated, both expressly and implicitly, that at the time of this conspiracy, while he was an officer in Braen, his authority, participation and perhaps interest, at least in the day-to-day operations, was limited. Evans said Sam Braen, Jr. "had no operative role" and more than once described his officership as one "on paper." Testimony from Evans indicated that at least until Evans left Braen in the latter part of February 1969, Sam Braen Jr. had had nothing at all to do with the pay-off scheme.
The bidding worked out as planned. Only P.T.&L. and Braen submitted bids and the Braen bid was substantially higher than that of P.T.&L. The contract was awarded to P.T.&L.
At the trial Evans testified freely to the promises of immunity from prosecution which were given him by the office of the Attorney General in exchange for his "cooperation" in the matter. He was cross-examined extensively by defense counsel, not only with respect to the grant of immunity in this case (as was another State witness) but in connection with that promised in another matter as well.
The State offered the testimony of seven witnesses. In addition to Evans, whose preeminent role in the entire scheme is described above, the State produced the Chief of the Bureau of Contract Administration in the Department of Transportation and the following of Braen (or associated companies) personnel during the time in question: the bid estimator for the project involved; one who had risen from the accounts receivable section and pricing department to become office manager; the general sales manager; a clerical employee *274 who had typed certain of the exhibits, and the credit manager and assistant treasurer.
The State then rested.
Defendants first argued, on motion, that the State had failed "to sustain its burden" of proof.[1] Following this, a chain of events, almost bizarre in nature, occurred. Defense counsel charged that the State "deliberately, consciously and presumably upon mature consideration determined not to call as a witness upon its case the unindicted co-conspirator, Sam Braen, Jr." Claiming that he had agreed "not to oppose the introduction of certain documentary evidence * * * upon the express representation by the Deputy Attorney General, the reliance thereon by me that Samuel Braen, Jr., be called as a State's witness" (a situation nowhere reflected in the record or even really inferable therefrom), and that the "general opening made by Counsel for the State, which to me indicated that the State had intended to produce these witnesses" (our review of the State's opening statement discloses neither such a representation nor any statements which might reasonably have been conceived to imply such a representation), defense counsel said that "that sort of risk voluntarily undertaken by the State * * * seems to me to entirely justify the Court in dismissing the Indictment."
The trial judge called upon the deputy attorney general for an answer. He then interrupted her explanation to advise her, "Now, before you say anything that you might regret, please, for you to now suggest that this Defendant was not given the understanding that you were going to call Sam Braen, Jr., I frankly find incredible."
*275 Her response was candid. The following occurred immediately thereafter:
[DEPUTY ATTORNEY GENERAL]: I'm not going to say to this Court that I didn't, when I started working on this case, and when we even began it, think that Sam Braen, Jr., would probably be a witness.
THE COURT: Now, why is he not here? Tell me that. Is it because of his physical condition or because you made a decision not to call him?
[DEPUTY ATTORNEY GENERAL]: They're probably three reasons.
THE COURT: All right. Tell me all of them.
[DEPUTY ATTORNEY GENERAL]: One is his physical condition.
Two, the impending Crabiel trial, and his needing to be a witness there. The trial started today. The office had to make a decision as to which case he would testify in, and where they needed him more, and they decided that the Crabiel case was more important; coupled with three, my feeling that Harry Evans had produced a prima facie case; that the State had in essence passed the motion here. So, there were three reasons.
THE COURT: Let's go back to number one. What about his physical condition, what was it about his physical condition that prevented you from calling him here?
[DEPUTY ATTORNEY GENERAL]: His physical condition is such that the man cannot testify for 40 minutes. He can't talk to someone for 40 minutes, and keep his train of thought. I've interviewed this man day in and day out, and he will sit there, and after 20 minutes, he's completely in space, and I represent that to the Court. I've spent enough time with the man that I don't feel that I could put him on the stand and subject him to cross-examination. That's one. Two, I was led to believe that he's ill.
[DEFENSE COUNSEL]: Judge * * *, may I interrupt?
THE COURT: No, no, Mr. [Defense Counsel]. We'll have any further discussions about this in Chambers. We'll take a few moments first.
(Recess taken.)
[DEPUTY ATTORNEY GENERAL]: Your Honor, the State has an application to reopen the State's case to permit us to present Mr. Sam Braen, Jr. Because of the day and Mr. Braen's physical schedule, it will be impossible for us to produce him today. I would ask, however, that we be allowed to produce him Monday morning when Court reconvenes.
THE COURT: Mr. [Defense Counsel].
[DEFENSE COUNSEL]: I will object to the application as what has gone before your Honor, but I won't extend my remarks on that subject.
*276 THE COURT: In view of the rather unusual circumstances involved in this particular situation, and considering the fact that it seems to me that the entire presentation of this case, if not hinging solely, was certainly or is certainly to a great extent dependent on the appearance of Mr. Braen, Jr. and the fact that the Defendant, I think should not be denied the right to cross-examination and discredit, if possible, the testimony of Mr. Braen, rather than having the Jury, where the status of the case is now, speculate quite possibly, unfairly to the Defendant as to what Mr. Braen would say, I will grant the motion. * * *
Promptly thereafter defense counsel, who, by his motion and with the aid of off-the-record "further discussions" in chambers about which we know nothing,[2] had apparently provoked the State into offering Sam Braen, Jr. as a witness, moved to dismiss the indictment because he had  and had had from a time prior to the commencement of the trial  a copy of a taped interview between a different deputy attorney general and Sam Braen, Jr. containing "the details of the promise or hope of leniency stated by [the deputy attorney general] and Braen's attorney" at a conference attended by Sam Braen, Jr. This, argued defense counsel, was a violation of defendant's right to discovery, in which he had sought "a statement of all promises of leniency made by any representatives of the State of New Jersey to potential witnesses, including, but not limited to * * * Samuel Braen, Jr."
*277 The judge found specifically that defendant had not been prejudiced by the failure of the State to disclose the existence of the tape. The only assertion of prejudice, as a matter of fact, was the statement of defense counsel that, "* * * I have no way of knowing of what else may not have been made available to me, and I assert continuing prejudice." The court replied:
Well, of course, that was the only basis for any decision of mine, Mr. [Defense Counsel], your application would get short shrifts because this is your choice. You did not have to bring this up at this moment in light of the status of the case, immediately prior to your motion. So, you can hardly, or I will not consider persuasive the argument that you have now limited or revealed an area of cross-examination, and consequently, of prejudice.
Nonetheless, the trial judge determined to grant the motion to dismiss the indictment. Analogizing with our policy of compelling the State to live up to its promises in plea bargains iterated in State v. Thomas, 61 N.J. 314 (1972), he said:
* * * So, we have a law which says that says the Prosecutor must decide what witnesses it's going to call, and we also have, if not law, at least to indicate that if a representation is made, that it should be lived up to. In this situation we have the matter compounded. The State rested its case without calling Samuel Braen, Jr., and only by a threat to the Court to dismiss the case that the motion to reopen was made and granted, but then I find that the State is in possession of other material relative to discovery about which I am sure [the trial Deputy Attorney General] knew nothing until this revelation this morning, and so again, we have the State engaging in tactics, which to me are completely unfair, improper, and I only use those words after lengthy consideration, and to some degree of soul searching because of the effect that any such decision or statement by me may have on the parties involved. I don't think in the handling of this matter that the State has dealt fairly with this Defendant. I don't find any case which says that a Defendant must prove prejudice by a reason of any failure of the State to comply with the rules. * * * So, the fact that the Defendant in this case became aware of the existence of these tapes eight days ago does not in my opinion excuse what I can only consider to be deliberate decision of the Attorney General not to reveal the existence of these tapes to the Defendant. Therefore, considering the entire matter in *278 the context that it has developed in this courtroom over this past week, I'm going to grant the motion of the Defendant to dismiss the Indictment against  of the Defendants, to dismiss the Indictment against these Defendants.
At a motion for reconsideration heard by the trial judge the following day, and after reviewing two affidavits submitted by the State, as to one of which the affiant was the deputy attorney general who had procured the tape in question, the judge refused to alter his decision to dismiss the indictment. On the other hand, he did amend his findings of fact substantially, and we believe significantly. Of prime importance in this respect was his determination, most reasonably reached on the record (State v. Johnson, 42 N.J. 146 (1964)), that the failure to furnish the tape was "negligent" rather than "deliberate." It appears that the tape was made in connection with a long, complicated, important investigation during the course of which Sam Braen, Jr. had been indicted, and firms and individuals other than Laganella and P.T.&L. were involved. It is said in the affidavit of the deputy attorney general involved that "all the information on the tape which was relevant to the P.T.&L. investigation was contained in the minutes of Braen, Jr.'s testimony before the State Grand Jury." The grand jury testimony was released to counsel for defendants in connection with discovery.
It should also be noted at this point that the State never denied promises of leniency to coconspirators who "cooperated." In fact, in her opening the deputy attorney general who tried this case for the State candidly conceded this "fact of life." It is also completely dispositive of the inadvertent nature of the State's failure to disclose the existence of the tape to defense counsel in this case that the tape was in fact among the discovery materials furnished to defendant Crabiel by the State in the matter of State v. Crabiel, which sprang from a related investigation in which Sam Braen, Jr. was evidently also implicated.
*279 The ultimate decision of the court, at the end of the motion for reconsideration, to dismiss the indictment, was grounded on a combination of the negligent (as contrasted with deliberate) failure to provide the tape and the State's decision not to call Sam Braen, Jr. as a witness. An absence of prejudice was specifically found with regard to the former element. No factual findings of prejudice appear with regard to the latter. The reason for imposition of the extreme sanction of dismissal seems bottomed by the trial judge on his fixed concept that "as an element of fair and proper trial tactics * * * a Defendant should not be put in a position by reason of representations by the Prosecution whereby he legitimately can anticipate that one or another of certain witnesses will be called." No factual findings appear with respect to such representations, despite the conclusion reached by the judge that "the State had clearly represented to the Defendant that it was going to call Samuel Braen, Jr., as a witness for the state."
No one will argue with the observation of the trial judge that an intentional, misleading misrepresentation of the State as to the manner in which it proposes to present its prosecution of defendant, relied upon by defendant in the preparation of his defense, constitutes a basic unfairness easily sufficient to undergird a declaration of a fatal lack of due process. A public prosecutor "must consistently refrain from any conduct that is lacking in the essentials of fair play." State v. D'Ippolito, 19 N.J. 540, 550 (1955). But in the absence of express findings here, we have searched the record in vain to find that which the trial judge characterized as a clear representation of the State that it was going to call Sam Braen, Jr. as a witness. There is no doubt, as admitted by trial counsel for the State, that Sam Braen, Jr. was thought by all, at least during the discovery period, to be an important witness. But it was in fact defense counsel who kept advising the court of the importance of Sam Braen, Jr. to the State's case, and not the deputy attorney general. We are not so overwhelmed by these repeated suggestions *280 that we would charge defendant with a continuing gambit to force the State into the production of this witness, but we observe that when counsel was discussing with the court the length of time the trial might take, defense counsel's asserted projections were so peremptory that the deputy attorney general commented, "Maybe [defense counsel] should try both sides of the case, and that way he can be certain as to how long we'll both be." A finding of a clear representation by the State that it intended to produce Sam Braen, Jr. as a witness is not susceptible of being reasonably reached upon the record below, despite the conjecture of both defense counsel and the court as to what the State might reasonably be expected to do.
This conclusion eliminates any vice from the State's unwillingness to produce the witness, for it is an unfair representation that offends due process and not trial strategy. Clearly the prosecutor of a criminal indictment at trial has wide discretion with respect to the production of proofs. State v. Murphy, 36 N.J. 172, 178 (1961). In passing, it is to be observed that an absence of desire on the part of the State to call Sam Braen, Jr. as a witness is entirely consistent with the State's theory, announced in its opening and expounded by Evans' testimony, that he "was little more than a spectator."
The problem arose here because, in the words of the trial judge, defense counsel's "entire line of examination of the State's witnesses was based, at least to some significant extent, on the assumption that sooner or later as part of the State's case he was going to be able to cross-examine Samuel Braen, Jr." As we have said, we find no support in the record for the statement of the trial judge that this was "not based on any assumption on his part that Mr. Braen was going to be called, but rather based on what I consider to be a rather firm statement by the Prosecution that he was going to be a witness." This being so, defendants must bear their own responsibility, in misguessing the State's intentions, for any prejudice. Beyond this, we have trouble *281 divining any prejudice: Samuel Braen, Jr. was as available to defendants as a witness as he was to the State. While defendants quite properly "do not assert that the instant conduct of the prosecutor was in direct violation of the Confrontation Clause of the Sixth Amendment," they do assert that "the ultimate result of the prosecutor's decision regarding Sam Braen, Jr., if carried to its logical conclusion, would have been violative of the Sixth Amendment." They claim this "tactic * * * would have shifted to defendants the burden of first developing the State's case so as to permit meaningful cross-examination." In answer to this we can do no better than again remind all concerned, including these defendants, that the trial of a criminal indictment is nothing more nor less than a search for the truth, and not a matter of gamesmanship. As pungently put by the late Chief Justice Vanderbilt, in his comments pertaining to the then "new" rules of practice and procedure, at the induction of our Supreme Court:
* * * Litigation is no longer to be thought of as a battle of wits, or a trial as a sporting event conducted for the benefit of the spectators. The rules of pleading and the various pretrial procedures are directed to facilitating the establishment of truth, which is the ultimate aim in the administration of justice. * * * [Rutgers L. Rev., Special Number, 1948, at 69]
Accordingly, we test the exercise of judicial discretion employed by the judge in dismissing the indictment only in terms of the failure to disclose the tape, for under the final clause of R. 3:13-3(f) we are certain of the trial judge's right, within a sound exercise of his discretion in a given circumstance, to dismiss an indictment for failure of the State to comply with rules of discovery.
Unquestionably, the prosecutor has a duty to disclose to a defendant promises or agreements of leniency exchanged for cooperation by an accomplice, codefendant or coconspirator, at least upon proper inquiry. State v. Taylor, 49 N.J. 440, 447-448 (1967). Here there was such inquiry, and *282 notably, disclosure was made. The question then becomes whether an inadvertent, negligent,[3] if you will, failure to disclose in part warrants the extreme sanction of dismissal of the indictment. We think not.
We have acknowledged the unquestioned requirement of fair play by a prosecutor. State v. D'Ippolito, supra. Were we to have reason to suspect chicane, even in a minor degree, we would not hesitate to affirm. Beyond this, it is clear that an unconstitutional deprivation of due process exists where the State, even in good faith, suppresses evidence favorable to an accused. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We do not doubt that the same offense might well occur upon the suppression of evidence which is reasonably calculated to lead to evidence impugning the credibility of the State's witnesses. State v. Taylor, supra; State v. Blue, 124 N.J. Super. 276 (App. Div. 1973).
But two distinguishing features mark the matter before us. First, the State did not conceal or suppress in the literal sense; in fact, it disclosed. Second, the fact that its disclosure, by sheer mistake, did not extend to the outer limits of its knowledge was neither a suppression nor a concealment in the legal sense. Before a dismissal of an indictment is warranted in such circumstances, we believe there must be a finding of intention inconsistent with fair play and therefore inconsistent with due process, or an egregious carelessness or prosecutorial excess tantamount to suppression. In the absence of these conditions, the right of the public to its day in court in the prosecution *283 of properly found indictments should be forfeited only if otherwise there would be manifest and harmful prejudice to defendant. Such is not the case here, a fact properly found by the judge below.
Accordingly, we hold that the dismissal of the indictment below was a mistaken exercise of discretion on the part of the trial judge. This determination makes it necessary for us to consider the other aspect of this appeal: whether the State has a right to appeal such a wrongful dismissal. Our concern arises in three areas: (1) Rule 2:3-1; (2) fair play or due process of law, and (3) an unconstitutional double jeopardy.

Rule 2:3-1
We are not insensitive to an argument that since R. 2:3-1 permits an appeal by the State or, when appropriate, a seeking of leave to appeal, from a dismissal of an indictment only when such judgment is entered before or after trial, the State is prohibited from appealing any dismissal of an indictment which occurs during trial. Despite the tentative draft comment that the rule is intended "to constitute a complete catalogue of the State's opportunities for appeal in criminal actions," we doubt that a limitation beyond the constitutional double jeopardy limitation is intended by the rule. We come to this conclusion by reading R. 2:3-1 in pari materia with R. 3:10-3 which speaks to the defenses to an indictment outside matters of proof on the merits: failure of the indictment to charge an offense or the unconstitutionality or invalidity of the statute or regulation said in the indictment to be violated. The direction that such matters not be considered during the trial is explicit. Such matters thus are ripe for consideration only before the empaneling of a jury and the taking of testimony (i.e., jeopardy) or after a conviction (an acquittal would obviate the need to dismiss the indictment). This procedure was obviously formulated to avoid where *284 possible any double jeopardy question in the particular situations which, by definition, did not deal with the merits. Designed to aid the review of indictment dismissal without double jeopardy concern, the rule should not be construed to limit other review of indictment dismissals, in extraordinary circumstances. State v. Fiore, 69 N.J. Super. 122 (App. Div. 1961), certif. den., 36 N.J. 142 (1961), involved a trial on the merits and is distinguishable. Compare and contrast State v. Emmett, 108 N.J. Super. 322 (App. Div. 1970). If double jeopardy concerns exist in such cases, so be it: it is time enough then, as here, to deal with the problem. In this case we do so below.

Due Process of Law
Except as it arises again in connection with the double jeopardy problem discussed below, we do not tarry long with the alleged due process question said by defendants to compel an affirmance. Due process in its constitutional sense is little more than a metonym for fair play. State v. Haber, 132 N.J.L. 507, 512 (Sup. Ct. 1945). It connotes fundamental fairness. Due process is an element which, when missing, produces the reaction accorded to that which is "shocking to the universal sense of justice." United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). But due process is no more than this. Our very proper reverence for this basic ingredient in the constitutional government of our nation and State must not be permitted to lead to such an indefinable expansion of the concept that its limitless bounds are in themselves unfair to a legitimate interest.
We perceive nothing fundamentally unfair about permitting the State review in a case where, inspired by defendants' motion, a judge has erroneously aborted a trial and terminated the litigation wholly on a procedural ground. Cf. State v. Farmer, 48 N.J. 145 (1966), cert. den., 386 U.S. 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). Fortunately *285 for all of our citizenry, the judges who sit on our trial bench are, in large number, possessed of "a conscience acutely aware" of the seriousness of the matters before them and the unavoidable and urgent necessity for a "balancing of the interests of the defendant and the public." State v. Farmer, supra, 48 N.J. at 174. When, in pursuit of this duty, zeal occasionally is responsible for the commission of a judicial wrong to the public at the behest of a defendant in a criminal case, we see nothing at all unfair  leaving aside double jeopardy considerations for the moment  with judicial review of that action. As was said in a different context in State v. McKnight, 52 N.J. 35 (1968),
* * * When the guilty go undetected, or, if detected, are nonetheless set free because plain evidence of guilt is suppressed, the price is exacted from what must be the first right of the individual, the right to be protected from criminal attack in his home, in his work, and in the streets. Government is constituted to provide law and order. The Bill of Rights must be understood in the light of that mission. [at 52]
We reach this conclusion without regard for a question which occurs respecting the fairness employed by the interests who now claim due process. The judge below commented directly and indirectly at least twice on defendants' awareness of the existence of the tape before the trial began. It did not escape observation by the trial judge, nor does the fact elude us, that defense counsel waited to make his motion respecting the tape not only until the State rested but even thereafter, until the State had been persuaded (to say the least) to move to reopen its case. This particular lack of candor, while understandable from a gamesmanship approach, does not particularly inspire sympathy for one claiming to have been injured by the lack of candor in his adversary. However, we need not, and accordingly do not, decide the issue of due process in this case on the narrow ground of comparative unfairness.

*286 Double Jeopardy[4]
At the outset we observe that the double jeopardy prohibition in the New Jersey Constitution varies from that in the United States Constitution. The former directs that "No person shall, after acquittal, be tried for the same offense." N.J. Const. (1947), Art. I, § 11. The prohibition against double jeopardy appears in the Fifth Amendment to the latter: "* * * [N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb; * * *." The distinction is unimportant for our purposes. The United States Supreme Court has held that the double jeopardy clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Our Supreme Court has held the respective clauses to be coextensive in application. State v. Rechtschaffer, 70 N.J. 395 (1976).
But the injunction against one's being put in jeopardy twice for the same offense preceded both constitutions, finding its place in the common law from the Magna Charta of King John in 1215. State v. Labato, 7 N.J. 137, 143 (1951). Despite the antiquity of the doctrine and the frequent occasion for its review, our courts are reluctant to set a hard and fast rule, likely at some time to be unjust to either the State or the defendant. As a consequence one *287 guideline is inescapable under both the United States Supreme Court cases and those of the State of New Jersey: each case must turn upon its own facts in a determination as to whether the bar of double jeopardy is to be applied. State v. Farmer, supra; State v. Hudson, 139 N.J. Super. 360, 363 (App. Div. 1976), certif. den., 70 N.J. 524 (1976) cf. Illinois v. Somerville, 410 U.S. 458, 464, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). This caveat serves well to alert us to the fact that resolution of double jeopardy problems depends on far more than a simple determination of when "jeopardy attaches," said in earlier cases to occur not later than when a jury was empanelled and often accorded essentially dispositive weight. State v. Locklear, 16 N.J. 232 (1954). But see, United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Consequently, we have become increasingly candid in our facing up to an awareness that important interests other than those of defendant alone are involved in the trial of criminal cases. State v. Rechtschaffer, supra. This salutary truth has caused us to reconsider the doctrine of double jeopardy more in terms of the evil against which it was designed to forfend and less as a matter of slavish adherence to ritualistic formula. The rationale involved in this ongoing process has recently been fully described in three decisions of major import from our Supreme Court. State v. Rechtschaffer, supra; State v. Kleinwaks, 68 N.J. 328 (1975); State v. Sims, 65 N.J. 359 (1974). The authorities have been exhaustively set forth therein and considered, and no useful purpose is to be served by a repetitive general discussion here of those authorities. It is sufficient for our purposes to note that clearly the mere empanelment of a jury and commencement of a case does not automatically provide a criminal defendant with a bar to further prosecution in certain circumstances.
But while we have certain ground rules, and know, for instance, that (1) a mistrial may not invoke double jeopardy protection (Farmer, supra) although in certain *288 circumstances it may (Rechtschaffer, supra); (2) double jeopardy does not bar the successful appeal by the State from a judgment of acquittal n.o.v. following a guilty verdict by a jury (Kleinwaks, supra) or following a jury trial wherein the jury could not agree and was discharged (State v. Kluber, 130 N.J. Super. 336 (App. Div. 1974), certif. den., 67 N.J. 72 (1975)), and (3) the State may appeal without double jeopardy problems from the grant of a new trial (Sims, supra), the precise question which confronts us has not been resolved in New Jersey: where a trial judge, on the motion of a defendant, in good faith but erroneously dismisses a criminal indictment as a sanction for a purported failure of the State to adhere to principles of fairness in the prosecution of that indictment, should double jeopardy considerations bar an appeal by the State and a reversal and remand for trial by the appellate court? We think not.
As we noted above, certain due process concerns isolated from those inherent in double jeopardy considerations become involved. We dispose of those at the outset in order that the uncluttered double jeopardy question may be dealt with as such. For instance, in the question posited immediately above we refer to the purported lack of fair play by the State. The adjective is intentional: if the State had in fact been unfair, the ruling of the judge would be left undisturbed and the double jeopardy question would be moot. We are convinced, for reasons set forth at length above, that while the State may have been mistaken, it did not operate unfairly. No one here questions the conduct of the judge as being other than completely in good faith. We would add also that it is clear the relief sought was granted on the motion of defendants.
It is upon these postulates we consider the double jeopardy question, which then reduces itself essentially to this: are there any considerations involved in a dismissal of an indictment (as contrasted with a judgment of acquittal; Kleinwaks and Kluber, both supra) during trial (as contrasted *289 with following the entry of a jury verdict; see Sims, supra) which should alter the rationale to be employed here from that utilized in the cited cases. Again, we think not. Indeed, with respect solely to considerations of annoyance, harassment and expense, it would seem defendants are here less embarrassed than in the cited cases because, on their own motion, they have avoided so far the presentation of their own witnesses, even once.
We return to basics. The principle concern of the law, organic or otherwise, and the commendable moralistic basis for that concern, has to do with an unbending purpose "to shield the freeman from the oppressions and persecutions of arbitrary government." State v. Labato, supra, 7 N.J. at 144. Consequently, we have outlawed prosecution or punishment twice for the same offense. United States v. Jenkins, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); but see, United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). We have additionally and as carefully guarded against an unreasonable harassment, declaring "that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). Neither of these principles is offended here, where it was the State rather than defendants which was frustrated in its effort to serve the ends of justice with dispatch.
It is that frustration, produced by the motion of defendants, that serves to distinguish the result in Jenkins, supra. In Jenkins the court pointedly noted that the terminated trial "could have resulted in a judgment of conviction." 420 U.S. at 370, 95 S.Ct. at 1013 Not so in the matter before us; because at the point when defendants' motion was erroneously granted on a procedural ground (as distinguished from a determination on the merits), defendants had not yet had an opportunity nor been called upon to present their defenses, and this despite the fact that *290 the trial judge determined  we think correctly  that a prima facie case had been made out.
As basic as the protection for defendants is the "[p]ublic interest in seeing that there is a fair trial designed to end in a just and equitable judgment." State v. Rechtschaffer, supra, 70 N.J. at 395; Wade v. Hunter, 336 U.S. 684, 688-689, 69 S.Ct. 834, 93 L.Ed. 974 (1949), reh. den., 337 U.S. 921, 69 S.Ct. 1152, 93 L.Ed. 1730 (1949). To apply the bar of double jeopardy in the instant matter, absent compelling considerations of fairness to defendant or for the purpose of protection against governmental action found by us not to be arbitrary, would disserve that purpose, for there still has been no trial on the merits. Moreover, and as importantly, we find in the record "no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed." Wade v. Hunter, supra, 336 U.S. at 688-689, 69 S.Ct. at 837.
We reverse the judgment of dismissal of the indictment and remand for new trial.
NOTES
[1] This motion, characterized by defense counsel in his reference "to what I'll call Roman Numeral II, to me the more challenging aspect of this motion" as an intrinsic part of one "motion" he was making, really constituted a separate motion for a dismissal on the merits of the State's case. The court below treated it this way, correctly, we believe, and as correctly, denied it with the comment that he had "no problem" with it. State v. Reyes, 50 N.J. 454, 458-59 (1967).
[2] There is a hint in the later findings of the trial judge that the State's motion to reopen was made "only by a threat to [sic] the Court to dismiss the case." We presume this occurred in chambers. In fairness to the trial judge, it should be pointed out that at the final day of hearing, when he refused to change his decision to dismiss the indictment, he did say:

* * * Miss [Deputy Attorney General], I agree with your suggestion or your intention that the Court should not, cannot tell the State what witnesses to call. I thought I had made that clear, and that that was the Court's understanding when I made my ruling last Thursday. The cases are clear that the Prosecutor has the authority, the discretion to decide what witnesses to call, and it's not up to the Court to direct that a Prosecutor call one witness or another, * * *.
[3] We are in wholehearted agreement with the trial judge in the extraordinary circumstances of this case that the failure of the State to disclose the tape was an accident caused by the nature of the whole proceedings. Early in the case, during discovery motions, the judge had commented, with regard simply to the one aspect of the whole matter with which he was concerned, that, "The rule respecting discovery obviously did not contemplate this type of matter * * *."
[4] It has not escaped our attention that on oral argument of defendants' motion below to dismiss, the deputy attorney general expressed fears for double jeopardy implications of a dismissal. Trial counsel for defendants, who has asserted double jeopardy in his brief and who vigorously argued its application to us, told the trial judge on the motion that he could not "conceive of how double jeopardy would attach. As much as I would like to preserve that ground, that does not strike me. I concede [sic; probably "conceive"] no basis upon which I could succeed by arguing double jeopardy if your Honor's ruling stands, and the State appeals." A case might well be made for waiver, but we do not choose to determine this important issue on that ground.