STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. CURTIS SIMS AND RONALD WARD, DEFENDANTS-RESPONDENTS.

Argued February 4, 1974—Decided July 16, 1974.

362

*Mr. Martin F. Siegal,* Assistant Prosecutor of Essex County, argued the cause for plaintiff-appellant (*Mr. Joseph P. Lordi,* Prosecutor of Essex County, attorney; *Mr. R. Benjamin Cohen,* Assistant Prosecutor, and *Mr. Siegal,* of Counsel and on the brief).

*Mr. Robert Westreich,* Assistant Deputy Public Defender, argued the cause for defendants-respondents (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Westreich,* of Counsel and on the brief).

The opinion of the Court was delivered by

CLIFFORD, J. This case calls upon the Court to clarify the law in New Jersey with respect to when the State may appeal the grant of a new trial to a criminal defendant. It thus requires reexamination of the standard set forth in dictum in *State v. LaFera,* 42 *N. J.* 97, 104 (1964) which would permit a State to seek leave to appeal only if the trial court's grant of a new trial were based on a question arising outside or collateral to the record. Were that standard adhered to, the new trial awarded to defendants here would not be appealable.

 We conclude that there is no continuing logic to the distinction made in *LaFera* between new trials based on errors outside the record on the one hand, and new trials based on errors of law on the record or factual errors on the other. We therefore enlarge the dictum of *LaFera* and hold that the State may seek leave to appeal from any new trial order in a criminal case.[1]

Defendants Curtis Sims and Ronald Ward were each indicted and tried before a jury for possession of lottery slips on September 16, 1971, in violation of *N. J. S. A.* 2A:121–3(b), and for working for a lottery on the same day, contrary to *N. J. S. A.* 2A:121–3(a). The jury found the defendants not guilty on the possession charge, but guilty of working for a lottery. Believing that evidence which had been introduced as to police surveillances prior to September 16, 1971 was admissible to show the element of knowledge on the part of defendants as to possession, but not as to "working for," the trial judge ordered a new trial since, he reasoned, the remaining evidence was insufficient to support the conviction rendered. In addition, he believed that as a matter of law the verdicts were inconsistent.

Leave to appeal was granted to the State by the Appellate Division which thereafter denied a motion by defendants to dismiss the State's appeal. While the matter was pending unheard in the Appellate Division, this Court granted the State's motion for certification, 63 *N. J.* 561 (1973), pursuant to *R.* 2:12–2, at the same time denying another defense motion for dismissal of the appeal.

The facts leading to defendants' convictions are as follows: Suspecting that gambling operations were being carried on out of Minnie's Luncheonette in Newark, the police department conducted surveillances of the premises on five

---

[1] As early as 1930, the *A.L.I. Code of Criminal Procedure*, § 428 (Official Draft 1930–31) suggested that the state be allowed to appeal from an order granting a new trial. No limiting language was used, and apparently all such orders were included.

days in 1971 — August 28, September 11, September 13, September 14, and September 16, the last date being the date charged in the indictment. The surveillance operation was carried on primarily through binoculars from an abandoned building about 50 yards from the luncheonette. Some observations were also made by a plainclothes man on the street and from a police car parked about 30 yards away. During the five days the officers assigned to the investigation noticed numbers of people who would park their cars near the restaurant, enter, and leave after a few minutes without having anything to eat. Several of them handed small white objects to Sims or Ward. Occasionally the defendants would approach vehicles pulling up to the store and receive white and green objects from the drivers.

On August 28, Detective Arthur Williams entered the luncheonette to have a cup of coffee and overheard Ward tell a woman that they were not "doing business" because "Joe Joe Walters was busted yesterday or the day before * * *." On September 11 he saw Ward write down notations and accept money from several people who entered the store but did not order anything to eat. Among these people was a known lottery writer. On September 13 and 14, during two hour surveillances on each day, Detective Williams observed that Sims was approached by five or six people every fifteen minutes and exchanged currency and white pieces of paper with them.

On September 16, the date charged in the indictment, Detective Michael Minovich observed Sims approach more than a half dozen people on the street and accept from them papers and green objects believed to be money. Ward was seen engaged in a similar transaction with a known lottery writer. Soon thereafter the police raided the luncheonette, finding a package of lottery paraphernalia in the stove and a pad of white slips on the counter. Sims and Ward, on the premises at the time, were arrested. Detective Minovich, however, could not state with certainty that the objects exchanged

that day were lottery bets, nor was Sims seen writing anything on that day. No lottery slips were found in Sims' or Ward's actual possession.

Although the trial judge believed that the evidence was "very thin," he rejected motions by defendants for a judgment of acquittal made both at the conclusion of the State's case and at the end of the trial. He instructed the jury that it could consider the evidence of the prior surveillances, as follows:

 \* \* \* The indictment charges the commission of these offenses on September the 16, 1971. You will recall during the course of the trial that I admitted certain evidence on other dates

 \* \* \* \* \* \* \* \*

 . Under our law, since [possession of lottery slips] is a crime in which knowledge is an element, that is admissible and relevant to the issue as to whether or not the possession of the slips on September 16th, 1971, was a knowing possession.

 Now, I must emphasize and repeat to you that was the sole and the limited purpose for which I permitted that evidence to go in \* \* \*

 Now the defendants are also charged in the second count in the indictment with the crime of knowingly working for a lottery \* \* \*

 Now before the defendant or defendants can be found guilty on this count, the State must prove these elements:

 \* \* \* \* \* \* \* \*

 2. That he knew that the business was a lottery business \* \* \*

His instruction was based on the case of *State v. Gattling,* 95 *N. J. Super.* 103 (App. Div. 1967), certif. den., 50 *N. J.* 91 (1967), which had held admissible evidence of prior surveillances to demonstrate that the defendant had knowledge of the fact that the slips he possessed were lottery slips. Although the trial judge here did not specifically instruct the jury that the prior surveillance evidence was admissible on the "working for" charge, the jury might easily have deduced as much, since it was instructed that knowledge was an element of that offense also.

However, in granting the motion for the new trial, the trial court made it very clear that he did not believe prior surveillance evidence was admissible on the "working for"

charge, and therefore not only was the evidence insufficient to convict on this charge but the two verdicts were inconsistent. The inconsistency arose, he believed, since, omitting the evidence of the prior surveillances, the only evidence remaining to show "working for" was the possible constructive possession which defendants had of the lottery paraphernalia. However, the defendants were found innocent of possession.

In granting a new trial on this basis the trial judge was clearly in error. The question is whether the State should be able to rectify that mistake of law through this appeal or whether the erroneous order for a new trial must stand.

Until this Court's decision in *State v. LaFera, supra,* New Jersey had no definitive statement of the law on the right of the State to appeal in a criminal case. Although a few cases reflected the general rule that the State could not appeal from a new trial order, *State v. Haines,* 20 *N. J.* 438, 447 (1956); *State v. Smith,* 21 *N. J.* 326, 332–333 (1956), in several instances appeals by the State from a trial court action vacating a judgment and ordering a new trial were entertained, *State v. Rosania,* 33 *N. J.* 267 (1960), *cert.* den. 365 *U. S.* 864, 81 S. Ct. 828, 5 *L. Ed.* 2d 826 (1961); *State v. Levitt,* 36 *N. J.* 266 (1961).

In *LaFera* the defendants were convicted of a conspiracy to rig bids on a public project. They were awarded a new trial because a juror was biased and had prejudged the case. The State was granted leave to appeal. Before the appeal was argued in the Appellate Division, this Court granted certification to review both the propriety of the granting of a new trial and the defendants' original convictions. The Court, per Chief Justice Weintraub, concluded that (1) the State should be able to seek leave to appeal from a new trial order based on matters collateral to the record; (2) in this case, the premature judgment of one juror did not warrant a new trial, and (3) the evidence presented was not sufficient to establish a conspiracy. Therefore the convictions were reversed with a direction to enter judgments of acquittal.

In deciding that the State should be free to seek leave to appeal in a situation such as that posed by *LaFera,* Chief Justice Weintraub utilized an historical analysis. He observed that "[a]lthough the State could not appeal from an order granting a conventional motion for a new trial, it could appeal from a judgment in a *habeas corpus* proceeding." The reason was that *"habeas corpus* was regarded as a separate civil proceeding rather than a step in the criminal cause and hence the State could seek review as in any other civil matter." 42 *N. J.* at 101. Realizing, however, that the distinction between a motion for a new trial and a proceeding in *habeas corpus* had been "somewhat obscured by recent events," *id.,* and that the reach of *habeas corpus* was much greater than in the past, he hinged the State's right to appeal on the nature of the issue presented rather than the technical nature of the proceeding by which it was raised. *Id.* at 103. The type of issue which should be appealable by the State in a challenge by it to a new trial granted a defendant, the Court stated, was one involving lack of jurisdiction or fundamental unfairness, remediable under the expanded view of *habeas corpus.* Such an issue would be "collateral in nature" and involve "issues not litigated in the main case." On the other hand, if the order were based upon the record of the trial itself, the State should have no right to appeal.[2]. *Id.*

---

[2] While other jurisdictions which allow state appeals from a new trial order do not adopt the *LaFera* distinction between collateral and non-collateral matters, some limit state appeals based on a law-fact dichotomy. This is done either statutorily, Conn. Gen. Stat., § 54–96 (1968) ; Kan. Stat. Ann. § 62–1703 (1964) ; Vt. Stat. Ann. tit. 13, § 7403 (1958), or by court decision, *Commonwealth v. Melton,* 402 *Pa.* 628, 168 *A.* 2d 328, 329 (Sup. Ct. 1961; *Commonwealth v. Zeger,* 193 *Pa. Super.* 498, 165 *A.* 2d 683, 686 (Super. Ct. 1960) ; *State v. DesChamps,* 126 *S. C.* 416, 120 *S. E.* 491 (Sup. Ct. 1923) ; *State v. Taylor,* 60 *Wash.* 2d 32, 371 *P.* 2d 617, 621 (Sup. Ct. 1962). See *State v. Gecht,* 17 *Wis.* 2d 455, 117 *N. W.* 2d 340 (Sup. Ct. 1962). Some of these decisions have held, unrealistically, that where the reason for the new trial order is one of law *and* fact, the new trial order is not appealable by the State. *Commonwealth v. Mel-*

The *LaFera* court went on to say that whenever a *habeas corpus* type judgment leads to a new trial, the order should be deemed interlocutory for purposes of appellate procedure. Thus, such an appeal is not of right, but leave to appeal must be sought. *R.* 2:5–6(a).

The above discussion of *LaFera* reveals that the grounds upon which the State may base an appeal are keyed to the practice in *habeas corpus* proceedings. Difficulty in interpreting *LaFera* has arisen because of the distinctions based on these grounds. While Chief Justice Weintraub acknowledged that the reach of *habeas corpus* has been expanded to include denials of "fundamental fairness," the present reach of *habeas corpus* ten years after *LaFera* seems, for better or for worse, infinite. The record of the trial, once considered immune from collateral attack, *Riddle v. Dyche,* 262 *U. S.* 333, 336, 43 S. Ct. 555, 67 *L. Ed.* 1009, 1011 (1923), may now be scrutinized to insure that a *habeas* petitioner has had a full and fair hearing. *Townsend v. Sain,* 372 *U. S.* 293, 313–319, 83 S. Ct. 745, 9 *L. Ed.* 2d 770, 786–90 (1963); Wright & Sofaer, "Federal Habeas Corpus for State Prisoners: The Allocation of Fact-finding Responsibility," 75 *Yale L. J.* 895, 946–53 (1966). It now seems that all matters, including the sufficiency of evidence, will be considered on *habeas* if it is shown that they deprived the defendant of a fair trial. *United States ex rel. Mayberry v. Yeager,* 321 *F. Supp.* 199, 206 (D. J. 1971). See also *United States ex rel. Cannon v. Maroney,* 373 *F.* 2d 908, 910 (3d Cir. 1967); *United States ex rel. Mertz v. New Jersey,* 423 *F.* 2d 537, 539–540 (3d Cir. 1970); *United States ex rel. Watson v. Yeager,* 548 *F.* 2d 23, (3d Cir. 1972); *United States ex rel. Mallory v. Myers,* 240 *F. Supp.* 373, 374 (E. D. Pa. 1964), aff'd, 343 *F.* 2d 912 (3d Cir.

---

ton, *supra; Commonwealth v. Zeger, supra.* Since almost all decisions involve a mixture of law and fact in some degree, this standard seems likely to create as much confusion as does the *LaFera* rule presently in New Jersey.

1965.), *cert.* den., 381 *U. S.* 943, 85 S. Ct. 1781, 14 *L. Ed.* 2d 706 (1965); *State v. Cynkowski,* 10 *N. J.* 571 (1952).

The *LaFera* court's very characterization of *habeas corpus* as a civil action (thus justifying a state appeal in such proceeding) is open to question. The Supreme Court has extended many of the rights accorded a criminal defendant to a *habeas* petitioner. For example, an indigent petitioner must be provided with a free transcript for purposes of appeal, *Long v. District Court of Iowa,* 385 *U. S.* 192, 87 S. Ct. 362, 17 *L. Ed.* 2d 290 (1966), and a $4 filing fee cannot be exacted from an indigent as a precondition to his filing a *habeas* petition, *Smith v. Bennett,* 365 *U. S.* 708, 81 S. Ct. 895, 6 *L. Ed.* 2d 39 (1961). In both cases the Court said that classifying *habeas* as civil or criminal was not determinative. In *Harris v. Nelson,* 394 *U. S.* 286, 293–294, 89 S. Ct. 1082, 22 *L. Ed.* 2d 281, 287, reh. den., 394 *U. S.* 1025, 89 S. Ct. 1623, 23 *L. Ed.* 2d 50 (1969), the Court has also said that the characterization of *habeas corpus* as civil is "gross and inexact," the proceeding being essentially unique.

Not only is the distinction drawn in *LaFera* presently unworkable, as discussed above, but additional arguments persuade us that *LaFera* should be extended to all new trial orders. The English common law provided no basis for either side to appeal in a criminal case. Miller, "Appeals by the State in Criminal Cases," 36 *Yale L. J.* 486, 490–91 (1927); Orfield, "Appeal by the State in Criminal Cases," 15 *Oreg. L. Rev.* 306 (1936). It is for this reason that appeals in the United States are based primarily upon statutory authority, which has developed along divergent paths in the various states.[3] In all jurisdictions, however, the right to appeal has been more grudgingly granted to the State than to the defense. See *Carroll v. United States,* 354 *U. S.* 394, 400, 77

---

[3] A summary of state statutes on this point can be found in *ABA Project on Standards for Criminal Justice Relating to Criminal Appeals* 35–58 (Approved Draft, 1970).

S. Ct. 1332, 1 *L. Ed.* 2d 1442, 1447 (1957). There are several reasons for this lopsided development, none of which convinces us that the resulting advantage to the defendant is justified.

Most frequently mentioned as a reason for denying the State broad rights of appeal is the constitutional prohibition against placing a defendant in double jeopardy. See, *e. g., United States v. Sanges,* 144 *U. S.* 310, 12 S. Ct. 609, 36 *L. Ed.* 445 (1892); *State v. B'Gos,* 175 *Ga.* 627, 165 *S. E.* 566 (Sup. Ct. 1932). However, the modern view, on which commentators appear to agree, is that double jeopardy bars only a completely new prosecution after a final judgment has been rendered. The jeopardy begins when the jury is sworn and does not end until all the facts and law are decided, however many appeals and new trials it takes. See *Kepner v. United States,* 195 *U. S.* 100, 134, 24 S. Ct. 797, 49 *L. Ed.* 114, 126 (1904) (Holmes, J. dissenting); *United States v. Tateo,* 377 *U. S.* 463, 84 S. Ct. 1587, 12 *L. Ed.* 2d 448 (1964); *Moreland, Modern Criminal Procedure* 277 (1950); Kronenberg, "Right of a State to Appeal in Criminal Cases," 49 *J. Crim. L. & P. S.* 473, 476 (1959); Miller, "Appeals by the State in Criminal Cases," 36 *Yale L. J.* 486, 496 (1927); Comment, "State Appeals in Criminal Cases," 32 *Tenn. L. Rev.* 449, 458 (1965); Note, "The State Right to Appeal: Has Maine been too Cautious?" 21 *Maine L. Rev.* 221, 233 (1969). As one commentator has inquired, if there is no double jeopardy when the defendant appeals, why should it attach when the state appeals? Miller, "Appeals by the State in Criminal Cases," 36 *Yale L. J., supra* at 496. It also seems persuasive of this point of view to reason that even if double jeopardy is legitimately raised by a state appeal, the defendant waives his rights against suffering prosecution more than once when he requests a new trial. *Trono v. United States,* 199 *U. S.* 521, 533–534, 26 S. Ct. 121, 50 *L. Ed.* 292, 297 (1905). Certainly, it seems clear that far from putting a criminal defendant in jeopardy a second

time, a reversal of an order for a new trial, instigated by a state appeal, places him in the precise position he was in after the verdict in his first trial. In no sense is a second prosecution begun; rather, the matter is likely to be brought to a close.

The second reason frequently offered in opposition to state appeals is that they permit the marshalling of the vast resources of the state against an individual defendant such that he will be unable to meet the renewed legal arguments for lack of funds. See Friedenthal, "Government Appeals in Federal Criminal Cases," 12 *Stan L. Rev.* 71 (1959). Today, however, this argument has less weight than in the past. Indigents have, for example, the right to counsel on first appeal as of right, *Douglas v. California,* 372 *U. S.* 353, 83 S. Ct. 814, 9 *L. Ed.* 2d 811, reh. den., 373 *U. S.* 905, 83 S. Ct. 1288, 10 *L. Ed.* 2d 200 (1963), but see *Ross v. Moffit,* —— *U. S.* ——, 94 S. Ct. 2437, 40 L. Ed. 2d —— (1974); and to free transcripts, *Griffin v. Illinois,* 351 *U. S.* 12, 76 S. Ct. 585, 100 *L. Ed.* 891, reh. den., 351 *U. S.* 958, 76 S. Ct. 844, 100 *L. Ed.* 1480 (1965). Also, the problem becomes negligible where state appeals are not as of right but are discretionary with the appellate court. Such discretion can be exercised to prevent ill-founded appeals which will serve only to harass a defendant. Since a discretionary system exists in New Jersey, *R.* 2:3–1, *R.* 2:5–6(a), we need not be unduly concerned that state appeals will take an unreasonable toll on defendants who are granted new trials.

The final argument asserted to defeat state appeals in criminal cases is that no statute specifically provides for them and therefore courts have no power to hear them, no such authority existing at common law. *United States v. Sanges, supra; Carroll v. United States, supra; State v. Curley,* 161 *P.* 831 (Okla. Crim. App. 1916). Although New Jersey has no statute specifically on point, the New Jersey Constitution, Article VI, Section II, paragraph 3, provides that the Supreme Court shall promulgate the rules of practice and procedure. Under this grant of power this Court has

promulgated *R.* 2:3–1(b) (5) which provides that the State may seek leave to appeal from "an interlocutory order entered before or after trial." Since *LaFera* it has been clear that all trial court orders leading to a new trial, if they are reviewable, shall be deemed interlocutory for the purpose of appellate procedure. 42 *N. J.* at 104. This is so because such an order is "but an intermediate step which serves to renew the criminal controversy." *Id.*

It is especially significant for purposes of this case that a comment accompanying the 1966 publication of Rule 2: 3–1(b) (5) stated that "the tentative conclusion of the committee was to omit the exception based on *LaFera* from the rule [and] submit the question to the Court's further consideration." The proposed rule was adopted without change by order of February 25, 1969, thereby inferentially obliterating the distinction set out in *LaFera.* Thus, it might be argued that we have already decided the issue of state criminal appeals in adopting this rule. Certainly it provides adequate authority, in lieu of statutory sanction, for appellate courts to hear state appeals of new trial orders. *State v. Browder,* 486 *P.* 2d 925 (Alas. Sup. Ct. 1971); *State v. Taylor,* 60 *Wash.* 2d 32, 371 *P.* 2d 617 (Sup. Ct. 1962).

There are additional positive reasons for allowing the State the full right to seek leave to appeal in criminal cases. First, society is likely to be benefited by the development of the criminal law in a fairer way, since errors favoring a criminal defendant will be less likely to be perpetuated. See *State v. Browder, supra.* Under such a system, too, trial courts are more likely to be more circumspect in their rulings since they can be reversed by appeals brought by either side. Under the present system of limited state criminal appeals there is sometimes an inclination on the part of trial courts to lean toward the defense in making rulings. Furthermore, under a more comprehensive system of state appeals, criminals justly convicted at a first trial will be less likely to avoid conviction finally due to errors prejudicial to the prosecution. Lastly, it should be pointed out that the

trial court will probably have granted the new trial on a claim of error in the proceedings which the defense would have raised on appeal had the new trial been denied. On appeal, the prosecution would have had its claims reviewed by the appellate court. Thus, under the system of limited State appeals as set out by *LaFera,* the prosecution in many cases loses the chance to seek a ruling from a higher tribunal which it would have had under slightly different circumstances. See *ABA Project on Standards for Criminal Justice Relating to Criminal Appeals* 39 (Approved Draft 1970).

 We take pains to make it clear that simply because we hold here that the State may seek leave to appeal any grant of a new trial, we do not at all suggest that leave should always be granted. Our decision in *Dolson v. Anastasia,* 55 *N. J.* 2 (1969), a civil case, has important bearing in the criminal area as well. *Dolson* pointed out that in reviewing a trial court's action on a motion for a new trial following a jury verdict, the appellate court must give deference to the views of the trial judge in certain areas. Although his determination as to worth of certain evidence, plausibility or consistency of individual testimony, and other tangible considerations apparent from the face of the record do not deserve any special deference, his views of credibility of witnesses, their demeanor, and his general "feel of the case" must be weighed heavily. Where these factors are primary in the grant of a new trial, it should be most rare that leave to appeal be granted to the State. Likewise, when a state appeal seems frivolous, an appellate court should not put a defendant through the rigors of an appeal but should allow the new trial to proceed.

 In addition, once an appellate court decides to review an order granting a new trial, it should be guided by essentially the same standard as that controlling the trial judge's review of a jury verdict. *Id.* at 7. This standard can be stated: the trial court's ruling on such a motion shall not be reversed unless it clearly and convincingly appears

that there was a manifest denial of justice under the law. *Id.* at 7–9. See *R.* 2:10–1.

■■ The new trial order in the instant case exemplifies that which should be reversed on appeal since it is erroneous for easily reviewable reasons of law. It is not true, as defendants argue, that the factors which influenced the trial judge to grant a new trial are not ascertainable. There is little doubt that his order was based on a literal reading of *State v. Gattling, supra,* and a faulty reading of *N. J. S. A.* 2A:121–3(a), and not from his "feel for the case," evaluation of witnesses' credibility or any other intangible factor. No legitimate purpose can be served by dissolving a jury verdict justly rendered. *N. J. S. A.* 2A:121–3(a) defines the crime of working for a lottery as follows:

> Any person who knowingly engages as a messenger, clerk or copyist, or in any other capacity in or about an office or room in any building or place where lottery slips or copies of numbers or lists of drawings or a lottery, drawn or to be drawn anywhere within or without this State, are printed, kept or used in connection with the business of lottery or lottery policy * * * is guilty of a misdemeanor. (Emphasis added).

Thus, as the statute makes clear, and as the trial judge himself instructed the jury, knowledge is an element of the crime in question. "[E]vidence that a person committed a crime or civil wrong on a specified occasion * * * is admissible to prove * * * knowledge" as an element of a crime or civil wrong committed on another specified occasion. *Evid. R.* 55. See also *State v. Lanzo,* 44 *N. J.* 560 (1965); *State v. Gattling, supra; State v. Connolly,* 120 *N. J. Super.* 511 (App. Div.), certif. den. 62 *N. J.* 88 (1972); Annot., "Admissibility, in Prosecution for Gambling or Gaming Offense, of Evidence of Other Acts of Gambling," 64 *A. L. R.* 2d 823 (1959).

Indeed, there is no reason to believe that the jury did not consider prior surveillance evidence on the "working for" count. The trial judge charged the jury that it could consider that evidence on the issue of knowledge. Although

this instruction was given as part of the "possession" charge, it was immediately followed by the instruction that knowledge was also an element of the "working for" count. The jury could reasonably have gathered that it should consider the evidence in deciding both counts since it had been told that knowledge was an element of both.

Even if the prior surveillance evidence was not considered by the jury on the "working for" charge, it was error to believe that the two verdicts were inconsistent.[4] The jury could have acquitted the defendants of possession, believing that they did not have sufficient custody of or access to the lottery slips. If this were the case, the issue of their *knowing* possession would not even have arisen. The legislature presumably created the two separate offenses of "possession" and "working for" precisely because it realized that gambling operations are carried on in as secretive a manner as possible and that the prosecution might not always be able to produce tangible evidence. Thus, evidence of furtive conduct or scanty records, which might not be sufficient to demonstrate possession, could legitimately support the inference that a defendant did use slips while working for a lottery. *State v. Romeo,* 43 *N. J.* 188, 207 (1964), *cert.* den., 379 *U. S.* 970, 85 S. Ct. 668, 13 *L. Ed.* 2d 563 (1965). See also *State v. DeStasio,* 49 *N. J.* 247, 252–253, *cert.* den. 389 *U. S.* 830, 88 S. Ct. 96, 19 *L. Ed.* 2d 89 (1967).

The order granting a new trial is reversed and the judgment of conviction is reinstated.

PASHMAN, J. (concurring and dissenting in part). I agree with the result reached by my colleague Mr. Justice Clifford. There is indeed no valid basis for a new trial. However, I feel compelled to indicate that the majority has

---

[4] While we do not reach it because of our determination that the two verdicts were not inconsistent, there nevertheless remains a question as to whether such inconsistency, if present, would render the verdicts fatally defective. See *State v. Coleman,* 46 *N. J.* 16, 42–43 (1965) and authorities cited therein.

made unwarranted observations and conclusions and perhaps has even enunciated superfluous judicial dicta.

Unlike the majority, I have no difficulty interpreting *State v. La Fera,* 42 *N. J.* 97 (1964). It is not unworkable nor is it confusing. That decision permitted an appeal by the State where the said grounds were "collateral in nature" and involved "issues not litigated in the main case." (42 *N. J.* at 103). The basis for that Court's conclusion was sound and most perceptive. The reasoning of Chief Justice Weintraub in *La Fera* was supported by his scholarly dissertation analogizing the State's right of appeal from a judgment in a *habeas corpus* proceeding to the right of an appeal from the granting of a motion for a new trial. There was no reason in that case for our Court to decide that the State had a right of appeal from an order for a new trial based on issues litigated in the main case or upon the record of the trial itself.

Although the *La Fera* Court ten years ago recognized the expanding "reach of *habeas corpus*" (42 *N. J.* at 101), the majority has unnecessarily committed the present Court to the extreme limits of this procedure. In an appropriate legal and factual setting, a full review of the scope of *habeas corpus* might be wise. This is, however, not the setting.

My colleagues have articulated three reasons as the bases opposing State appeal and they have responded to that opposition. I subscribe to that reasoning process. It is the "additional positive reasons" which give me some concern. I cannot agree with the observations and comments concerning safeguards which I firmly believe should belong exclusively to a defendant in a criminal trial. Society will not be benefited by resolving grey areas of "potential error" to the detriment of a defendant. In my opinion, State trial judges do not "lean toward the defense in making rulings." By and large, I believe they "call the shots" as they see them. In this instance, I do not think it is necessary to chastise or remind the trial bench of their judicial obligations. They

are well aware that they must discharge those obligations fully and completely.

The right of the State to seek leave to appeal under *La Fera* should be extended to any grant of a new trial. I am satisfied in this case that the mandate for a new trial was based on an erroneous interpretation of *State v. Gattling,* 95 *N. J. Super.* 103 (App. Div.), certif. den., 50 *N. J.* 91 (1967) and *N. J. S. A.* 2A:121–3(a).

The judgment of conviction should be reinstated.

PASHMAN, J., concurs in result.

*For reversal and reinstatement*—Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—7.

*Opposed*—None.