229 N.J. Super. 66 (1988)
550 A.2d 1241
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
TOD T. DAVIS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 18, 1988.
Supplemental Briefs Submitted November 4, 1988.
Decided November 28, 1988.
*69 Before Judges DREIER and HAVEY.
Alfred A. Slocum, Public Defender, attorney for appellant (William Welaj, Designated Counsel, of counsel and on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney for respondent (Julie Davidson, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant appeals from convictions of two counts of sexual assault, N.J.S.A. 2C:14-2b, and two counts of endangering the welfare of a child, N.J.S.A. 2C:24-4, with the latter convictions merged into the former. He was sentenced to two concurrent, indeterminate terms not to exceed seven years each at the Youth Correction Reception Center. The offenses grew out of defendant's assault upon two boys, three-year-old G.C., and four-year-old M.S., between April and July 1985 at the "frog pond" and "haunted house" behind the apartments where the boys resided.
In the Spring of 1985 the mothers of the two boys began to notice that their children were exhibiting peculiar behavior. G.C.'s mother testified that G.C. became hyperactive, had trouble sleeping, stained his pants, used sexual words, made hickeys *70 on his arms and tried to perform fellatio on himself. On at least one occasion, G.C. screamed when his mother tried to wash his anus, and she noticed a series of bruises across his back from hip to hip. G.C.'s mother, who kept a diary to track her son's hyperactivity, testified that G.C.'s behavior would often become uncontrollable after he returned home from playing at the frog pond between 12:30 and 2:30 p.m.
Similarly, M.S.'s mother testified that M.S. acquired sexual vocabulary and that she saw him trying to pull down another little boy's pants and his own pants. Someone even told her that M.S. and another boy were "kissing each other on their privates." On one occasion, M.S. complained that his anus was sore, and when his mother examined him, she found leaves and dirt in his anus.
The mothers sought advice from the Salem County Community College counseling center, and the Prosecutor's office was called in. Their investigation revealed that the manager of the apartment complex had several confrontations with a suspicious individual in August and December 1984 and again in January 1985. He testified that in August 1984 an individual was parked in a blue and white late-1960's model Chevy with the windows rolled up and the engine running. When the manager asked him what he was doing, the man replied that he was looking for Donna Baxter, a resident of the apartments. In mid-December, a resident complained to the manager about a suspicious man lounging behind the complex. The manager approached the man who told him that his name was "Billy" and that he was looking for Donna Baxter. Again in January 1985, the manager received another complaint that a suspicious man had taken a chair from someone's porch and was sitting in the woods behind the apartment complex. When the manager asked him what he was doing, the man said "he was walking home from work from the nuclear plant[1] and stopped there in *71 the woods to urinate." The manager testified that he asked the man to leave. M.S.'s mother also testified that she had seen defendant early in January, standing in the woods by the area where the children played, and again in February at a location near the apartment laundry room. She recognized him as someone she had gone to school with in sixth, seventh or eighth grade. She identified defendant in court.
Although the manager never saw this man at the apartment complex again, the manager was also a meter reader for South Jersey Water Supply Company. In March 1985 he went to a house to read the meter and recognized the man as well as his blue and white Chevy which was parked in the driveway. The manager further testified that on August 23, 1985, he returned to this man's house to read his meter and to make a positive identification of him for the police.
Based on this information and the boys' description of the sexual games that they played with Fat Boy (known to them also as Fat Billy),[2] defendant Tod Davis was questioned and photographed by the police. G.C. selected defendant's photograph from an array of eight pictures.[3] M.S. chose another picture from the same array, but J., another little boy who alleged sexual abuse, also identified defendant.[4]
*72 At trial, G.C. once again identified defendant's photograph from the array, although the prosecutor never asked him to make an in-court identification.[5] G.C. said that defendant was Fat Boy, the man with whom he had played at the frog pond and the haunted house. However, G.C. was not able to describe any of the games they played. M.S., on the other hand, made an incorrect identification,[6] but testified that when it had been warm outside, he and Fat Boy played a game called "dick-dick" which involved "[t]ouching each other, and you take off clothes and you suck peepees." M.S. originally testified that he only played with Fat Boy alone; however, he later stated that G.C. played with them at the frog pond.
Also testifying regarding identification were the apartment manager, the defendant and the defendant's wife. The manager made both an in-court and an out-of-court photo identification, as well as an in-court identification, of defendant as the person he saw at the apartment complex and at defendant's *73 home. The description the manager gave to the police of the man known to him as "Billy" was that he was chubby with red hair and a red beard.
Defendant testified that he had been laid off from the nuclear power plant in mid-March 1985 until the summer of 1985 during which time he stayed at his home in Pennsgrove helping his wife prior to and after the birth of their baby in late April. Defendant admitted that the manager had asked him to leave the apartment complex when he went to visit Donna Baxter; however, defendant contended that he told the manager that his name was Tod Davis and not Bill. Both defendant and his wife testified that the manager could not have returned to their home on August 23, 1985 to make a positive identification of defendant for the police, because the couple moved at the end of July. Defendant testified that he was not familiar with the haunted house, the frog pond or any of the children.
Defendant raises the following five points on this appeal:
POINT I:
The trial court erred in ruling that both victims were competent to testify.
POINT II:
The trial court erred in denying defense counsel's motion for a judgment of acquittal.
POINT III:
The jury's verdicts were against the weight of the evidence.
POINT IV:
The sentence imposed on Count IV was illegal.
POINT V:
The sentence imposed was manifestly excessive.
Given the recent United States Supreme Court decision in Coy v. Iowa, 487 U.S. ___, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), we must first allude to the closed circuit television procedure used to hear at least one of the children's testimony, even though defendant did not raise this issue on appeal.[7] *74 Although N.J.S.A. 2A:84A-32.4 specifically authorizes such a procedure, we will examine its constitutionality under R.2:10-2.
In Coy v. Iowa the Supreme Court held that the defendant's Sixth Amendment right to face-to-face confrontation was violated when a screen was placed between the defendant and the two 13-year old complaining witnesses. The witnesses allegedly were victims of sexual abuse, and the screen blocked the defendant from their sight, but allowed him to see and hear them. The Court refused to determine whether any specific exceptions exist to the right to confront one's accusers face-to-face. However, the Court noted that:
Whatever they may be, they would surely be allowed only when necessary to further an important public policy. The State maintains that such necessity is established here by the statute, which creates a legislatively imposed presumption of trauma. Our cases suggest, however, that even as to exceptions from the normal implications of the Confrontation Clause, as opposed to its most literal application, something more than the type of generalized finding underlying such a statute is needed when the exception is not `firmly ... rooted in our jurisprudence.' The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception. [487 U.S. at ___, 108 S.Ct. 2803, 101 L.Ed.2d at 867; citations omitted].
The New Jersey statute authorizing closed circuit testimony by a minor in child abuse proceedings, N.J.S.A. 2A:84A-32.4, enacted in 1985, differs from the Iowa statute in that it does not establish a presumption of trauma to justify this procedure. Instead, N.J.S.A. 2A:84A-32.4b requires the court both to find that "there is a substantial likelihood that the witness would suffer severe emotional or mental distress if required to testify in open court," and to make specific findings about the impact of spectators, the defendant and the jury on the child witness. In her concurrence, Justice O'Connor states that "nothing in today's decision necessarily dooms such efforts by state legislatures to protect child witnesses." 487 U.S. at ___, 108 S.Ct. at *75 2804, 101 L.Ed.2d at 868. Focusing upon the majority's language "necessary to further an important public policy," Justice O'Connor, specifically citing N.J.S.A. 2A:84A-32.4(b), states that the strictures of the Confrontation Clause may yield to the compelling state interest of protecting child witnesses if the trial court makes a "case-specific finding of necessity." Id. 487 U.S. at ___, 108 S.Ct. at 2805, 101 L.Ed.2d at 869.
The trial judge in our case, following State v. Sheppard, 197 N.J. Super. 411 (Law Div. 1984), made nine pages of findings, concluding that the video tape procedure could be used, with defendant having full video view of the witness and the ability to confer with his counsel, who would be in the room with the witness. N.J.S.A. 2A:84A-32.4d. See also State v. Bass, 221 N.J. Super. 466, 475-477 (App.Div. 1987), (the trial court's decision in Bass was determined under the common law existing prior to the 1985 statute, but reached the same result).[8]
While we do not at this time know if the United States Supreme Court will carve out any exceptions to the Confrontation Clause, we cannot say that the New Jersey statute requiring particularized findings falls within the absolute strictures of Coy v. Iowa. Unless and until either the United States or the New Jersey Supreme Court determines that Justice O'Connor was incorrect in assuming that our statute meets the minimum required constitutional protection, we determine that the procedures established by N.J.S.A. 2A:84A-32.4(b) are valid. Further, we find the "case-specific finding of necessity" noted by Justice O'Connor has been satisfied by the trial judge. We therefore will not on our own motion interfere with the verdict in this case on the basis that the closed circuit television procedure utilized at trial is unconstitutional.
Defendant contends first that the trial court erroneously ruled that both victims, the then four-year-old G.C., and five-year *76 old M.S., were qualified to testify as witnesses for the State.[9]
The presumption is that every person is qualified to be a witness. Evid.R. 7. Disqualification is warranted only if the requirements of Evid.R. 17 are not satisfied. State in the Interest of R.R., 79 N.J. 97 (1979). Evid.R. 17 provides:
A person is disqualified to be a witness if the judge finds that (a) the proposed witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth.
The trial court's competency determination will not be reversed on appeal "unless it plainly lacks support in the record below." R.R. at 113. When reviewing a trial judge's determination of the witness' qualification to testify, the appellate court is not limited to the voir dire examination of the child and may consider the entire record, including the testimony given by the witness under oath. Ibid.
*77 At the Wade hearing, the judge qualified G.C. as competent to testify after the following colloquy between G.C. and the prosecutor:
Q. If I said, [G.], my suit is red, am I telling the truth or am I telling a lie?
A. Telling a lie.
Q. And if I said to you, [G.], my suit is blue, am I telling the truth or am I telling a lie?
A. The truth.
Q. All right. And if I said, [G.], it's snowing in this room, am I telling the truth or am I telling a lie?
A. Telling a lie.
Q. Okay. [G.], what happens  what would happen if you would tell your mother a lie?
A. Then I would get a spanking.
Q. What do you think, if you told this man over here, the Judge, a lie, what would he do?
A. He would send me to jail.
Q. So do you know when you come in this room today that you must tell the truth.
A. I am.
M.S., at a Rule 8 hearing, likewise knew that his shirt was blue and that if the prosecutor said it was red, she would be lying. He testified that if he lied, his mother would spank him, and if he told a lie in court, "I would go out of court and I would never come back again." He would not be let back in "[b]ecause I told a lie." The judge also qualified M.S. as competent to testify.
The first prong of the Evid.R. 17 competency test requires that the witness have the ability to "understand questions and to frame and express intelligent answers...." State v. Grossmick, 153 N.J. Super. 190, 192 (App.Div. 1976), aff'd o.b. 75 N.J. 48 (1977). Reviewing the record as a whole, defendant can certainly argue a plausible case that G.C., although capable of answering the questions posed by the prosecutor at the Wade hearing, was unable to give much testimony at trial, even when he was taken out of the courtroom and placed in a conference room while the court viewed him on a closed circuit *78 T.V. monitor. The child, however, was capable of expressing himself; he was merely incapable of remembering any of the games he played with Fat Boy. Evid.R. 17, however, focuses on the witness' expression, not his memory. Memory, or lack thereof, bears only upon the weight that the trier of fact should attribute to the testimony. R.R., supra, 79 N.J. at 116.
The second prong of the competency test requires that the witness possess "moral responsibility." State v. Grossmick, supra, 153 N.J. Super. at 192. The witness must understand the difference between right and wrong, that to tell the truth is right and that in some way he will be punished if he lies to the court.
In R.R. the court held that the four-year-old victim understood his duty to speak the truth because he "equated truthfulness with `good' and lying with `bad,' and stated that he tried never to be `bad' for fear of receiving a beating." 79 N.J. at 114. Likewise, in State v. R.W., 104 N.J. 14 (1986), the three and one-half-year-old victim was ruled competent to testify even though the child "equated truthfulness with telling what was `real' and lying with telling that which was `pretend.'" Id. at 18. Given these standards, M.S. and G.C. demonstrated they knew the difference between telling a lie and the truth. Although G.C. never stated that he knew lying was bad or telling the truth was good, M.S., on cross-examination, said that it was wrong to tell a lie.[10] Even as to G.C., however, a reading of his *79 testimony as a whole, as well as the psychologist's evaluations, permits us to sustain the finding of testimonial competence. R.R., 79 N.J. at 113. As noted earlier, he stated that he would be punished by the judge if he lied, and that he must tell the truth.
Defendant next contends that the trial judge erroneously denied his motion for a judgment of acquittal at the close of the State's case. The appropriate standard of review is
whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. [State v. Reyes, 50 N.J. 454, 459 (1967); see also State v. Moffa, 42 N.J. 258, 263 (1964) (applying the same standard to appellate review)].
Defendant's challenge requires this court to examine each of the four charges to determine whether a reasonable jury could have returned a guilty verdict on the basis of the State's evidence.
A conviction for sexual assault requires that the defendant commit "an act of sexual contact" with a victim younger than 13 years old. N.J.S.A. 2C:14-2b. "Sexual contact" is an intentional touching by either the victim or the perpetrator of the intimate parts of either the victim or the perpetrator for the purpose "of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-1d. M.S., who was four years old during the Spring and Summer months of 1985, testified that he and Fat Boy and on one occasion, G.C., played "dick-dick," which involved touching and sucking penises. M.S. also stated that he and Fat Boy played with G.C. at the frog pond. M.S.'s mother further testified to her son's bizarre sexual vocabulary and behavior, and that on at least one occasion M.S.'s anus was sore and filled with leaves and dirt.
*80 G.C., who was three-years old at the time of the incident, identified defendant as Fat Boy. Although G.C. said he played with Fat Boy, he was unable to remember or describe any of the games they played.[11] G.C.'s mother also testified to sexual vocabulary and behavior, rectal pain and bruises across his back.
A conviction for endangering the welfare of a child, a crime of the fourth degree, requires the defendant to have caused or permitted a child under the age of 16 to engage in a prohibited sexual act which includes nudity and fellatio. N.J.S.A. 2C:24-4. The same facts as related above would therefore be applicable for these two counts as well.
The State must establish both that the crime occurred and that the defendant was the perpetrator. The two problems that are raised here are that M.S. can tell about the crime, but not about the perpetrator, while G.C. has identified the defendant as the perpetrator, but can not testify about the crime.[12] Defendant claims that each of the witnesses was allowed to impermissibly bolster the missing part of the other witness' case. The judge, however, properly found that this was a classic case of circumstantial evidence, with the jury's right to draw reasonable inference therefrom. State v. Reyes, supra, 50 N.J. at 459.
However, G.C. did identify defendant as Fat Boy. The problem of G.C. not being able to relate at trial the games played with Fat Boy is not fatal to the State's case. G.C.'s mother was *81 able to and did describe G.C.'s newly acquired vocabulary, sexual behavior and physical condition all of which were evidence of sexual abuse. Furthermore, M.S.'s statements of G.C.'s presence corroborated the source of the behavior.
Giving the State every reasonable inference, there was sufficient evidence to withstand a motion for a judgment of acquittal. R.3:18-1.
Defendant further argues that the trial judge erroneously denied his motion for a new trial because the jury's verdict was against the weight of the evidence. The motion should not have been granted unless "there was a manifest denial of justice under the law." R.3:20-1. The trial court's ruling may not be reversed on appeal unless "it clearly appears that there was a miscarriage of justice under the law." R.2:10-1. We must give great deference to the jury's assessment of the witnesses' credibility and demeanor and the general "feel of the case." State v. Sims, 65 N.J. 359, 373 (1974); State v. Carter, 91 N.J. 86, 96 (1982).
Defendant lists the following as support for his claims: M.S.'s complete failure to identify defendant; G.C.'s incorrect second identification of defendant; G.C.'s inability at trial to describe the games he played with Fat Boy; J.'s alleged contact with Fat Boy a year after the original incidents and his identification of someone else's photograph as Fat Boy even though he had identified defendant a year earlier as Fat Boy; and the manager's statement that he returned to defendant's house and identified him for the police in August, although defendant moved out of that residence in July. Yet this is a case of circumstantial evidence and a certain amount of conflicting details and identifications. The jury's task is to sort out the discrepancies, weigh the evidence and come to a conclusion. Although the identification evidence was scant, it is sufficient for a jury to have reasonably arrived at a guilty verdict.
*82 Defendant next asserts that the sentence imposed on Count IV of the indictment is illegal. Count III charged defendant with sexual assault of M.S., Count IV with endangerment of M.S., Count IX with sexual assault of G.C., and Count X with endangerment of G.C.. The judge "grant[ed] the motion of defense counsel to merge Counts 9 and 10 with Counts 3 and 4  they charge endangering the welfare of the children, because they are lesser included offenses  and they do merge in the second degree sexual assault." Later in the transcript, the judge sentenced defendant on "Count 3 charging sexual assault in the second degree" and "on the fourth count charging sexual assault in the second degree." Clearly, from his language the judge intended to merge ten into nine and four into three; yet the judgment of conviction form erroneously indicates that the sexual assault counts were merged and the endangering the welfare of the children counts were merged. The record must be corrected to show merger of counts ten and four into counts nine and three respectively, with the sentences imposed for the remaining sexual assault counts.
Defendant lastly argues that the sentence imposed on the two second degree sexual assaults, two concurrent seven-year indeterminate terms, is excessive. He also contends that the trial court improperly weighed the aggravating and mitigating factors.
Under N.J.S.A. 2C:43-5, defendant was sentenced pursuant to the Young Adult Offenders Statute, N.J.S.A. 30:4-148, which provides that a defendant be sentenced to an indeterminate term of five years unless the statutory maximum is less than five years, in which event such lesser maximum will control. If the maximum is above five years, then the indeterminate maximum, for good cause shown, can be subject to the statutory maximum. Ibid. In this case, the presumptive term for a crime of the second degree is seven years. N.J.S.A. 2C:44-1f(1)(c). *83 Therefore, if good cause was shown, the maximum indeterminate term could correctly have been raised to seven years.
In addition to giving general reasons for imposing the sentence, the trial judge "should also state the reasons that constitute the `good cause' for raising the maximum." State v. Prewitt, 127 N.J. Super. 560, 565 (App.Div. 1974). In this case, the trial judge gave his reasons for imposing defendant's sentence, but failed separately to state his reasons for imposing a term greater than five years. Insofar as the judge weighed the aggravating and mitigating factors, he found them to be "more or less in equipoise." He then sentenced defendant to the presumptive term under N.J.S.A. 2C:44-1f(1), apparently making it indeterminate because he was a youthful offender. Yet the presumptive term for a youthful offender sentenced under N.J.S.A. 30:4-148 is five years, and can only be raised for "good cause."
The State argues that the trial judge implicitly indicated "good cause" for imposing an indeterminate term not to exceed seven years. Cf. State v. Porter, 210 N.J. Super. 383, 396 (App.Div. 1986) certif. den. 105 N.J. 556-557 (1986). In this case, however, the issue is moot, since defendant has already been released. Because the judge found that there was no preponderance of mitigating or aggravating factors, it would be difficult to justify an "implicit" enunciation of good cause as the prosecutor suggests. But since defendant's parole or probationary conditions will not be affected by the original sentence, N.J.A.C. 10A:71-3.3(a), we merely direct that the records be corrected to indicate an indeterminate term not exceeding five years.
The convictions are modified to show concurrent indeterminate terms not to exceed five years for two counts of sexual assault. As modified, the convictions are affirmed.
NOTES
[1] The nuclear plant is approximately 25 miles away from the apartments.
[2] Although at trial the boys only referred to the perpetrator as Fat Boy and not as Fat Billy, the investigator testified that the boys also called the perpetrator Fat Billy. She further testified that she was never sure whether Fat Boy and Fat Billy were the same person.
[3] At the Wade hearing, G.C. testified on redirect that he looked at the photo array twice, once looking for Fat Boy and once looking for Billy. The police lieutenant testified at trial that G.C. looked at two photo arrays only the first of which included a photograph of the defendant. G.C. chose defendant's photo from the first array and another picture from the second array. The investigator also testified that based on the children's initial stories, the police suspected there might be two men and even a woman involved.
[4] Six boys actually viewed the array; all but M.S. identified defendant as Fat Boy or Fat Billy. The prosecutor never introduced the additional identifications because the other boys decided not to testify, and all charges against defendant except M.S.'s and G.C.'s were dropped. Defendant, however, did present testimony from the investigating lieutenant that one of the other boys, J., had identified defendant's photograph from the array. According to the investigator, J. told her that on June 19th or 20th of 1986 he had another encounter with Fat Boy. A year earlier, J. identified defendant's picture as Fat Boy. Defendant not only introduced evidence of J.'s accusation, but also evidence in the form of time cards and his boss' testimony, that he could not have seen J. on those two days in June because he was at work all day. We will, of course, consider only that evidence admitted at trial. It is clear that although the judge at sentencing was aware through the presentence report of the other three identifications of defendant, the jury never heard about these additional corroboratory identifications.
[5] Although the trial judge granted the State's motion to present the two victims' testimony via closed circuit television, the prosecutor first attempted to have the boys testify in open court. When G.C., the first witness, faltered, the State opted to continue G.C.'s testimony over the monitor; M.S. testified only in open court, never on the monitor. This point, not raised on appeal, will be discussed infra.
[6] M.S. described Fat Boy as tall and thin, but he had some difficulty with these terms.
[7] Coy was issued on June 29, 1988, well after the trial below and the filing of appellate briefs. See also State v. D.R., 109 N.J. 348, 363, n. 5 (1988). We requested and have received supplemental briefs on this point, and note that defendant eschews claiming this confrontation point as error. In view of the public importance of the issue we will still briefly discuss it.
[8] Note that although Bass was decided prior to Coy v. Iowa, supra, it also employed the particularized trauma approach discussed herein.
[9] The inquiry into the boys' ability to understand their duty to tell the truth would be moot had proposed Evid.R. 63(33) become effective. The proposed rule provides:

A statement by a child under the age of 12 relating to a sexual offense under the Code of Criminal Justice committed on, with, or against that child is admissible in a criminal proceeding brought against a defendant for the commission of such offense if (a) the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 8(1), that on the basis of the time, content, and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of paragraph (b) of Rule 17. [Emphasis supplied].
See State v. D.R., 109 N.J. 348, 369-370, 375, 378 (1988). The Legislature is considering a Joint Resolution which would make the rule effective, and the Supreme Court Evidence Committee, in response to the mandate in D.R., 109 N.J. at 376-377, is considering proposals for clarifying language.
[10] A problem presented by the voir dire is that, somewhat disturbingly, M.S. testified that he would tell a lie on a friend although he would not tell one on someone who was not a friend. See State v. Zamorsky, 159 N.J. Super. 273, 280 (App.Div. 1978), certif. granted and remanded 79 N.J. 485 (1979), modified 170 N.J. Super. 198 (App.Div. 1979), certif. den. 82 N.J. 287 (1980), cert. den. 449 U.S. 861, 101 S.Ct. 172, 66 L.Ed.2d 78 (1980) (a six-year-old admits telling "little white lies"). The judge, however, with the aid of the testimony of a psychiatrist supplied by the defense, ruled that M.S. did understand his obligation to tell the truth.
[11] Even though G.C. failed to describe the games in court, the jury knew from the investigator's testimony that at an earlier date G.C. had related his story of sexual games.
[12] But for G.C.'s identification, connecting defendant as the perpetrator would be much more difficult. No adult was ever seen with the children while they played, and the apartment manager's and M.S.'s mother's identifications of defendant as the suspicious man seen at the complex on several occasions 6-10 months before the sexual incidents might be deemed too remote to constitute reasonable inferences for a jury to make.